IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SPYRIDON C. CONTOGOURIS and | : | CIVIL ACTION |
| STEPHEN A. BALDWIN | : | |
| | : | NO. 10-4609 |
| VERSUS | : | |
| | : | SECTION "F"(1) |
| WESTPAC RESOURCES, LLC, PATRICK | : | JUDGE FELDMAN |
| N. SMITH, KEVIN M. COSTNER | : | |
| and RABOBANK, N.A. | : | MAG. JUDGE SHUSHAN |
| | : | |
| | : | |
| | : | |

## FIRST AMENDED COMPLAINT

**TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA:**

Spyridon C. Contogouris and Stephen A. Baldwin amend their Original

Complaint as follows and with respect respresent:

I.

This is an action for misrepresentation in connection with the sale of

securities brought pursuant to 15 U.S.C. §78j, 17 C.F.R. §17.240.10b-5.  Plaintiffs

also seek recission of and/or damages in connection with a certain sale of

membership interests in Ocean Therapy Solutions, LLC, a Louisiana limited liability

company, pursuant to Articles 1949 and 1953 of the Louisiana Civil Code.

## PARTIES AND JURISDICTIONAL ALLEGATIONS

II.

Plaintiff Spyridon C. Contogouris ("Contogouris") is a person of the full age of majority and a citizen of this state domiciled in Orleans Parish, Louisiana.

III.

Plaintiff Stephen A. Baldwin ("Baldwin") is a person of the full age of majority who is a citizen and domiciliary of the State of New York.

IV.

Made defendant herein is WestPac Resources, LLC ("WestPac"), which upon information and belief is a Delaware limited liability company which has its principal place of business in the State of California.

V.

Also made defendant herein is Patrick N. Smith ("Smith"), a person of the full age of majority, who, upon information and belief, is a citizen and domiciliary of the State of California.

VI.

Also made defendant herein is Kevin M. Costner ("Costner"), a person of the full age of majority, who, upon information and belief, is a citizen and domiciliary of the State of California.

2

VII.

Also made defendant is Rabobank, N.A., a national banking association believed to be organized and existing under the laws of a state other than Louisiana which at all times pertinent had its principal place of business in the State of California.  Upon information and belief, Rabobank, N.A. had minimum contacts with the State of Louisiana and is subject to the personal jurisdiction of this Court.

VIII.

At all times pertinent herein, WestPac was owned, managed, dominated and controlled by defendants Smith and/or Costner.

IX.

This Court has jurisdiction as this action arises under the laws of the United States of America.  28 U.S.C. §1331.  As there is complete diversity among plaintiffs and defendants, jurisdiction also arises under 28 U.S.C. §1332.  The matter in controversy exceeds $75,000.00 exclusive of interest and costs. Plaintiffs bring state law claims under this Court's diversity and/or pendant and/or ancillary jurisdiction.

X.

Venue is proper in this district pursuant to 28 U.S.C. §1391.

## FACTUAL ALLEGATIONS

### XI.

In the early 1990s, defendant Costner financed and oversaw the development of an oil and water separation technology under the auspices of a corporation owned and managed by him, C.I.N.C., Inc., an acronym for "Costner in Nevada Corporation."

### XII.

In the early 2000s, Contogouris was approached by persons representing Costner to market the technology and the separation device invented at Costner's direction to various customers.  Contogouris entered into an agreement with C.I.N.C. under which he would receive a commission on sales of units made to customers located by Contogouris.

### XIII.

Contogouris and Costner remained in contact thereafter.  In 2001, Contogouris escorted Costner on a business trip to Greece to attempt to sell the technology to shipping interests.  Immediately prior to the events described herein, Contogouris and his family had a meal with Costner on April 17, 2010 in Biloxi, Mississippi where Costner was appearing with his band known as "Modern West."

4

XIV.

Costner's attempts to market the C.I.N.C. oil separation system proved unsuccessful, and, upon information and belief, he sold all of his rights to the technology and his ownership in C.I.N.C. to Bret Sheldon, an individual domiciled in Nevada, who continued to operate the business as C.I.N.C. Industries.

XV.

On April 20, 2010, a drilling rig under charter to BP, PLC ("BP") known as the "Deepwater Horizon" exploded, caught fire, and ultimately sank.

XVI.

Although initial media reports indicated no oil was leaking from the well being drilled by the Deepwater Horizon, Contogouris learned within days from industry sources that massive amounts of oil were spewing from the well site.

XVII.

In late April, 2010, Contogouris attempted to contact Costner to discuss the possible marketing of the technology to BP for its use in cleaning up what was to become the largest oil spill in United States history.  Costner could not be reached as he was filming a movie in Canada.  Contogouris spoke with a friend of Costner's, Tim Hoctor, who advised Contogouris that Costner had sold his interest in the technology to C.I.N.C. and that Hoctor was reluctant to raise the issue with

Costner because of the amounts of money Costner had lost in the venture to perfect and manufacture the oil separation system.

XVIII.

Contogouris therefore contacted Bret Sheldon and C.I.N.C. Industries to discuss obtaining an exclusive agreement to acquire the units for use in the Gulf of Mexico region.  Contogouris also attempted to approach BP about the use of the technology by traveling to BP's Unified Command Center in Robert, Louisiana, but was unable to gain access to decision makers with BP.

XIX.

Due to his inability to gain access to BP to market the system, Contogouris determined that he would need to bring in new partners who could lend assistance in gaining access to BP and to manage the company.

XX.

Stephen Baldwin, an actor, and Contogouris have been friends for many years.  On April 29 or April 30, 2010, Baldwin advised Contogouris that he would be coming to New Orleans to meet with a local attorney, John Houghtaling, who was discussing making a motion picture in which Baldwin would be the star. Baldwin asked Contogouris to attend a luncheon with Houghtaling to discuss the movie project.  During that meeting, Contogouris expressed the view that the

6

proposed movie would likely be unprofitable, and those interested in making a film should make a documentary film based on the BP oil spill.  Houghtaling immediately expressed interest in this idea.

XXI.

In the days that followed, Contogouris met with Houghtaling and mentioned to him his efforts to market the C.I.N.C. technology to BP.  Houghtaling indicated he could be of assistance in gaining access to BP and asked to be made a partner in the venture.  He also indicated that he knew another individual, Frank Levy, a resident of Metairie, Louisiana, who could lend assistance in the venture due to his knowledge of and experience in the offshore oil industry.  Levy was also an investor/backer in the proposed movie project.

XXIa.

Unbeknownst to plaintiffs at the time, in late April or early May, Costner had reached out to Bret Sheldon to encourgage him to abandon any marketing arrangement with Contogouris and to work exclusively with Costner for the marketing of separator units in the Gulf of Mexico.  When these efforts were unsuccessful, Tim Hoctor, Costner's friend, contacted Contogouris and asked that Contogouris contact Pat Smith, an individual domiciled in Santa Barbara, who Hoctor said "spoke for Kevin on all matters C.I.N.C. and the oil spill."

7

XXII.

On May 7, 2010, a Joint Venture agreement was confected between the following individuals and legal entities to market the C.I.N.C. technology to BP: Contogouris, Baldwin, Houghtaling, L&L Properties X, L.L.C., which was an entity formed by Frank Levy, Franco Valobra and WestPac.

XXIII.

On May 10, 2010, the joint venturers decided to reorganize the legal entity as a limited liability company, and on that date, Contogouris caused Ocean Therapy Solutions, LLC ("OTS"), a Louisiana limited liability company, to be organized with the Louisiana Secretary of State.  Contogouris was at that point, and through June 19, 2010, the first founding member, managing member, and largest shareholder of OTS.

XXIV.

On May 13, 2010, the negotiations with C.I.N.C. were successful and OTS entered into a marketing agreement with C.I.N.C. under the terms of which it had the exclusive rights to market the oil separation system in the Gulf of Mexico.

XXV.

On that same date, an Operating Agreement was executed that governed the management of OTS.  The original operating agreement reflected the

8

following ownership interests in OTS: Contogouris, 28%, Baldwin, 10%, Valobra,

5%, L&L Properties X, 15.5%, John W. Houghtaling, 21.5%, and WestPac, 20%.

Levy was installed as the CEO of OTS.  The prior joint venture agreement was

cancelled and declared null and void.

XXVI.

By this point in time, Costner had introduced the members of OTS to Smith,

who Costner identified as his business manager and business partner in WestPac.

Costner indicated to both Contogouris and Baldwin that Smith had his authority

to act on Costner's behalf and on behalf of Westpac in connection with their

dealings with OTS.  On May 14, at a meeting in Houghtaling's office attended by

Contogouris, Baldwin, Houghtaling and David Sherman, an attorney hired by OTS

to draft its operating agreement, Costner indicated that "Pat Smith and Dan

Grigsby (Costner's Los Angeles attorney) speak for me."  At all times pertinent,

plaintiffs aver that Smith was acting both on his own behalf and in his

representative capacities on behalf of Costner and Westpac.  At all times

pertinent, Grigsby was acting as an attorney in fact and agent on behalf of

Costner, Smith and Westpac.

XXVII.

BP agreed to watch the separator operate on May 13, 2010, and agreed to

test the unit for possible use in cleaning up the Deepwater Horizon spill.

XXVIII.

A difference in business philosophy developed between the members of

OTS.  Contogouris and Levy wanted the company to use a business model that

would insure recurring business and a possibility of marketing the device to other

major oil companies.  They proposed that the units be rented to BP at a fair price

in a long-term arrangement.  Houghtaling and Smith favored a "quick kill"

approach involving a one-time sale of the equipment to BP at a higher price.

XXIX.

This disagreement, coupled with a fall out between Houghtaling and Levy in

connection with the failed movie project which resulted in the filing of a suit by

Levy against Houghtaling in the 24th Judicial District Court for the Parish of

Jefferson in late May, 2010, prompted Levy to express his desire to withdraw

from OTS.  Without the prior knowledge of Contogouris and Baldwin, Levy and

Houghtaling entered into an agreement whereby Levy would convey his

membership interest in OTS to Houghtaling in exchange for a release from

Houghtaling of Levy's obligations in connection with the movie project and an

10

indemnity from OTS for Levy's involvement in the oil spill clean up venture.

Houghtaling agreed, and without prior knowledge of plaintiffs or OTS, acquired

Levy's 15.5% interest, part of the consideration for which was an indemnity given

not by Houghtaling, but by OTS.  Houghtaling replaced Levy as CEO of OTS.

Houghtaling later told Contogouris that he gave this 15.5% that he acquired from

Levy to Costner to deal with Costner's incessant complaints that he was

undercompensated for his involvement with OTS.  In a series of conference calls

held in late May through early June, Contogouris recalls that Costner repeatedly

stated that his contribution to OTS was undervalued and that he needed a greater

ownership percentage because "there's no business without me, Kevin Costner."

XXX.

Contogouris began to be uncomfortable with Smith's involvement in OTS.

Beginning in late May, Costner and Smith repeatedly told Contogouris and

Baldwin that they would be required to make a $1.14 million cash contribution to

fund the operation of OTS, although neither Costner nor Smith could articulate a

reason why the cash infusion was needed.  Contogouris told Costner and Smith

that he could raise $1 million of the $3 million cash infusion Costner and Smith

were demanding, but only if he knew the uses to which the cash would be put.

Costner and Smith also insisted that the cash contributions would be made to

11

Westpac, a minority shareholder, as a "matter of convenience."  The proposed

cash call sent to Contogouris on May 29 by Smith's assistant Bryan Bates

specifically stated that if the payment was not made, plaintiffs' interest in OTS

would be diluted.

### XXXa.

As an alternative to Contogouris and Baldwin making cash contributions to

OTS, discussions ensued with WestPac initially, and then Smith, proposing to buy

Contogouris' interest for $1.4 million, and to buy Baldwin's interest for

$500,000.00.   No agreement was executed in connection with these initial

discussions.  The original drafts of the agreement called for the sale to be made to

Westpac; however, it was understood that the interests were being in large part

acquired for Costner's benefit.  This is evidenced by numerous statements made

by Costner to Contogouris that Smith was acquiring these interests on his own

behalf and/or on behalf of Costner.

### XXXb.

During several conference calls, Contogouris repeatedly asked Costner and

Smith why the cash infusion of $3 million was needed.  He was told by Costner

and Smith that the money was need to purchase the units from C.I.N.C. before

they could be re-sold to BP.  This puzzled Contogouris because he believed the

business model, as well as all customer proposals he had seen, called for the customer to make a cash advance to fund acquisition of the units from C.I.N.C. This led Contogouris to believe that BP would not be making an advance deposit. As to other reasons for the cash call, the only explanation given came from Costner, and was that the situation was "fluid."  Importantly, Costner and Smith had the ability to force a cash call, since they now had the support of Houghtaling and Valobra, giving them the needed 60% super majority called for in the Operating Agreement.  Contogouris and Baldwin thus faced the choice of making a significant cash contribution for unspecified purposes to a company controlled by Costner and Smith, losing their interest, or selling it to Costner, Smith and/or Westpac.

XXXI.

By early June, 2010, BP had not been particularly responsive to OTS' overture.  The members of OTS therefore pressed forward with promoting the technology through media outlets.  Arrangements were made by Costner, Smith, and Houghtaling for Costner to testify before Congress on June 9, 2010 to discuss the technology and his efforts to have BP employ it to combat the oil spill.

13

XXXII.

BP agreed to meet with representatives of OTS on June 7, 2010.  The

meeting took place on the evening of June 7.  Present at this meeting were: Doug

Suttles, the COO of BP Exploration, the public voice of BP in connection with the

spill and the senior BP executive in charge of BP's incident command center in

Robert Louisiana; Smith; Houghtaling; and Costner.   Contogouris was present at

Houghtaling's home until Suttles arrived, and was then asked to leave by Costner,

Smith and Houghtaling.  Plaintiffs aver that they were purposefully excluded from

the BP meeting of this date.  Costner, Smith and Houghtaling in fact met with

Doug Suttles of BP on June 7, 2010 at Houghtaling's residence on Common Street

in New Orleans.  Upon information and belief, Louisiana Attorney General James

David ("Buddy") Caldwell, Sr. arranged for and attended all or a portion of the

meeting at the request of Houghtaling.

XXXIIa.

Plaintiffs aver that during the meeting, Suttles, as the BP point person on

the Deepwater Horizon spill: (a) signed a letter of intent with OTS indicating that

BP intended to purchase 32 units from OTS for a price of $52 million, which

included an $18 million advance deposit to OTS prior to receiving the units; and

(b) verbally committed BP to the purchase on those terms.  At a minimum, if

14

Suttles did not bind BP to the transaction, Suttles expressed his strong support for

the purchase and that he would vigorously work to obtain final approval from BP

to consummate the transaction.

XXXIIb.

Plaintiffs base these allegations on a combination of public statements

made by defendant Costner.  At some point between June 7 and June 10, Costner

gave an interview to ABC News' Good Morning America Anchor Sam Champion.

This interview was not published until June 14, 2010.  In that interview, Costner

said:

> But yeah, we got a letter of intent from BP, from Doug Suttles.
>
> And … I told him "we're a small company.  And … we need you to support this."  And he said, "I will support it."  And … I choose to believe him at this moment.  I looked across at him and he said, "I have just as much vested here as you do."  So I choose to believe Doug when he says "We're giving an order of 32."  We're going to need him to economically, you know, start the engine for the company.

Both Smith and Costner, the control persons of Westpac, were present

when Suttles made these statements.  Plaintiffs did not become aware of

this interview until months after it was published on the Internet.

XXXIIc.

The next morning, June 8, 2010, Contogouris had breakfast at the Loew's

Hotel in New Orleans with Smith and an intern working for Smith and/or Westpac,

Justin Maxwell.  Costner was supposed to come down for breakfast but was late.

He came down and met with Contogouris in the lobby, with Smith present.

Contogouris asked Costner "Do we have a deal?"  Costner replied that there was

no deal, only a non-binding letter of intent.  Neither Costner, nor Smith, who was

present, told Contogouris that:

> (a) The letter of intent would make OTS self-funding and obviate the need
>
>     for any investor cash contributions to the company because it called for
>
>     an $18 million advance deposit from BP;
>
> (b) Suttles was firmly behind the transaction, would support it, and had as
>
>     much vested in it as Costner and those involved with OTS; and
>
> (c) Suttles said "we're giving an order of 32."

Smith did not contradict Costner's statement of "no deal," nor provide the

additional details of the meeting with Suttles.  Costner and Smith, both

individually and as representatives of Westpac, knew during this breakfast

meeting that Contogouris and Baldwin were contemplating selling their interests

in OTS to Smith and/or Westpac.  This is apparent from the fact that Costner and

16

Smith asked Contogouris to send a copy of the proposed buy-sell agreement to

Costner's lawyer, Dan Grigsby, during the June 8 breakfast meeting at the Loew's

Hotel.  Contogouris complied with this request, and e-mailed the proposed

document to Grigsby at approximately 10 a.m. on June 8, 2010.

XXXIId.

During this June 8 meeting in the lobby of the Loew's Hotel, Costner and

Smith also told Contogouris that he and Baldwin would still need to make the cash

contribution to Westpac to fund OTS if they retained their shares.  This statement

was false, since both of them knew the Letter of Intent signed by BP called for and

Doug Suttles had committed to an advance deposit.

XXXIII.

Costner testified before Congress on June 9, 2010.  In his testimony,

Costner indicated that BP had placed an order for a number of units.   He also

testified that he was a main principal in OTS, while the company records indicate

that he held no ownership interest in his name.  He also indicated that he was an

owner of the technology, even though Sheldon had acquired the technology from

him many years before.

17

XXXIIIa.

Houghtaling also made public statements, including one on WWL Radio, indicating that BP had agreed during the June 7, 2010 meeting to purchase an initial order of 32 units.

XXXIIIb.

Costner reiterated his statement that BP had placed an order to the press. Contogouris, hearing these statements, attempted to contact Costner without success.  He therefore emailed Dan Grigsby, Costner's attorney, requesting a meeting or a few minutes of his time.  Although Grigsby said he was not in his office, he gave Contogouris his cell phone number and asked him to call.  When Contogouris spoke by phone with Grigsby on June 9, 2010, Grigsby, Costner's agent and attorney, confirmed to Contogouris that no agreement had been reached with BP.  Grigsby implored Contogouris not to share that information with anyone.

XXXIV.

Contrary to these public statements, Houghtaling told Contogouris that BP had in fact not placed an order, and these statements were being made by Costner and Houghtaling to pressure BP into making an order.  Contogouris later learned that Houghtaling was in Santa Barbara with Costner and Smith when he

18

made these comments to Contogouris by phone.  Contogouris relayed this

information to Baldwin and expressed to Baldwin that this strategy of Costner,

Smith and Houghtaling was deceptive and inappropriate when dealing with an

important customer such as BP.  Both Contogouris and Baldwin were operating

under the impression that BP had not made a purchase commitment for any

separator units from OTS based upon Costner's direct and Smith's implicit

statement at the Loew's Hotel that no deal had been made with BP.   Costner and

Smith, both individually and on behalf of Westpac, despite having a fiduciary

obligation to do so, did not disclose to plaintiffs that BP agreed to an $18 million

advance deposit, and that Suttles had verbally committed to purchase 32 units.

To the contrary, Costner and Smith continued to insist that Contogouris and

Baldwin would be required to make a cash contribution to fund the operation of

OTS.

XXXV.

On June 8, 2010 Contogouris flew to Los Angeles to enter into a binding

sale of his membership interest to Smith and/or WestPac for $1.4 million.  The

original proposed agreement called for WestPac/Smith to pay the purchase price

in full upon execution of the agreement.  Smith and Costner's attorney Dan

Grigsby indicated to Contogouris on June 10  that due to Smith's pending divorce

19

settlement, he could not raise the full purchase price by June 11, and would make an initial down payment of 10% on June 11, to be followed by a final payment on June 18 of the balance, at which time the membership interests would be transferred. This was a false statement made to allow Costner, Smith and Westpac to acquire plaintiffs' interest in OTS out of the $18 million deposit made by BP. The purchase agreement recited that Smith would pay for the membership interests, and this proved to be a false statement, as OTS' own funds from the BP advance deposit were used to make the purchase. As previously alleged, plaintiffs aver that Smith was acquiring these interests on his own behalf and/or on behalf of Costner. The final document transferring the membership interests expressly provided that they were being transferred to Smith *or his* designee, which plaintiffs always believed was Costner. This was part of a scheme to deprive plaintiffs of their pro-rata rights to the distribution of these monies prior to the sale of their interests, and to in effect acquire plaintiffs' interest with monies that rightfully belonged to them as distributions or dividends from OTS.

XXXVI.

On June 11, both Baldwin and Contogouris entered into that certain "Transfer, Withdrawal, Release and Indemnity Agreement" under the terms of which Contogouris would convey his 28% interest in OTS to Smith or WestPac for

$1.4 million, and Baldwin would transfer his 10% interest to Smith or WestPac for $500,000.00.   On June 11, 2010, wire transfers in the amount of $140,000 and $50,000 respectively were sent from WestPac's RaboBank, N.A. account number 122238420 to Contogouris and Baldwin's bank accounts, representing the down payment.  The "Transfer, Withdrawal, Release and Indemnity"agreement was an agreement to sell, and thus was not to become effective until paid in full by Patrick Smith and/or Westpac in accordance with the agreement.

### XXXVIa.

Plaintiffs aver that Westpac, Costner and Smith all benefitted from the transfer of plaintiffs' 38% interest in OTS either directly or indirectly.  If the sale was actually to Westpac, from whose account the payment to plaintiffs was made, then Costner and Smith benefitted from their ownership interest in Westpac.  If the sale was to Smith only, plaintiffs aver that Smith was acting either in whole or in part on Costner's behalf, and was holding all or part of the membership interests in his name for the benefit of Costner and/or Westpac.

### XXXVII.

Unbeknownst to both Baldwin and Contogouris at that time, BP issued a purchase order to OTS on June 12, 2010 for 32 units for a gross price in excess of $52 million.  At this time, Baldwin and Contogouris were still shareholders of OTS

21

as they had not been paid in full for their shares and were therefore entitled to

their pro-rata share of any distribution to be made out of the BP advance deposit.

The BP purchase order called for an initial deposit of $18 million to be made to

OTS pending delivery.  On June 14, 2010, Costner, Smith and WestPac

clandestinely, secretly and wrongfully caused an unauthorized bank account in

the name of OTS to be opened at Rabobank, N.A. in California.  Bryan Bates, who

was represented by Smith to Contogouris to be the Chief Financial Officer and

bookkeeper of WestPac and Patrick Smith, participated in the opening and

managing of this account.  The opening of this account by OTS was not authorized

by its members, which at that time included both Baldwin and Contogouris.

Patrick Smith was not an authorized officer of OTS and had no authority to open

such a bank account, which ultimately, upon information and belief, was used by

Costner and Smith as their own personal piggy bank.  Houghtaling, as CEO of OTS,

confirmed that the account was not authorized in a letter sent by Houghtaling to

Rabobank in July, 2010.

XXXVIII.

All without the knowledge of plaintiffs, after creation of this account,

Costner, Smith, Bates and WestPac, or persons working at their direction,

prepared a commercial invoice to BP calling for the $18 million deposit to be

22

made to OTS by wire to the newly opened, unauthorized Rabobank account in the name of OTS and not to the bank account of OTS in Louisiana previously authorized by Contogouris, the founding member, and Houghtaling, the only duly authorized CEO.

XXXIX.

On June 15, BP's Doug Suttles announced publicly that an order for 32 units had been placed.  BP wired the $18 million deposit to OTS's Rabobank account on June 16, 2010.  The financial terms of the order were not disclosed publicly by BP or by defendants.  Plaintiffs were thus completely unaware of this advance until July 12, 2010, when Houghtaling told Contogouris of the BP advance deposit,   At the time plaintiffs transferred their interest in OTS, they believed that a cash call would still be required because this is what Costner and Smith told them. Houghtaling also said on July 12 that Costner, Smith and Houghtaling had agreed during the airplane flight to California after Costner's Congressional appearance and prior to plaintiffs' sale of their interest that they would make a distribution to themselves, but not to the plaintiffs, out of the BP advance deposit when it was received.

XL.

On that same date, June 16, 2010, Smith e-mailed Contogouris that "he had the cash" and was prepared to close on the sale of the membership interests held by Baldwin and Contogouris.

XLI.

Although not discovered by Contogouris or Baldwin until mid-July, 2010, on the morning of June 18, 2010, Costner, Smith, Bates and/or WestPac, or persons operating at their direction, arranged for the unauthorized funds transfer from the unauthorized OTS Rabobank account to WestPac's Rabobank account for the purpose and for the amounts Smith and WestPac needed in order to consummate the acquisition of the Baldwin and Countogouris membership interests.   Upon information and belief, Costner, Smith, Bates and/or WestPac, engaged in the conversion of limited liability company funds for the acquisition of plaintiffs' interests in OTS and in effect disguised these transfers to illegally purchase plaintiffs' interest in OTS, all to the detriment of the minority members of OTS, including plaintiffs.  Such use of OTS' funds was in violation of the Operating Agreement signed on May 13, 2010.  Contogouris became aware of these illicit funds transfers when he was shown in July, 2010 an OTS ledger for the unauthorized bank account by Chuck Jaundot, the chief financial officer of

Houghtaling's law firm who was responsible for maintaining the financial records of OTS.

XLII.

On the evening of June 18, 2010, Contogouris and Baldwin honored their contractual obligation to do so and signed the pro- forma documents called for in the June 11, 2010 agreement to transfer their membership interests to Smith and/or WestPac.  The balance of the purchase price to effect the transfer was wired to Contogouris and Baldwin from WestPac's Rabobank account using the same monies converted from OTS out of the BP deposit by Costner, Smith, Westpac or persons acting at their direction.

XLIII.

In effect, Costner, Smith and/or WestPac had acquired Contogouris and Baldwin's interest in OTS using funds that belonged to OTS that were surreptitiously and improperly transferred from the unauthorized OTS Rabobank account to WestPac.  This action effectively robbed plaintiffs of a distribution that otherwise would have been payable to plaintiffs.  Contogouris and Baldwin were paid for their shares with a portion of monies that should have been paid to them as dividends and/or distributions from OTS.

25

XLIV.

Neither Contogouris nor Baldwin would have entered into the agreement made on June 11 to transfer their interest to Costner, Smith and/or WestPac had they known that:

(1)     Costner, in Smith's presence, misled plaintiffs by stating on June 8 at the Loew's Hotel, that there was "no deal" was misleading because the statement omitted critical information, particularly that Doug Suttles of BP would support the transaction, had a vested interest in seeing it completed, and said that "we're giving an order of 32";

(2)     The Letter of Intent signed by BP called for an $18 million advance deposit which would make OTS self-funding and obviate the need for a cash call from investors, which Costner and Smith insisted was still necessary even after BP signed a letter of intent calling for an advance deposit and after Suttles indicated he would economically support the transaction;

(3)     Suttles had committed to support the transaction, had a vested interest in it, and had said that "we're giving an order of 32";

(4)     OTS' funds, being part of the BP advance deposit, would be used to purchase plaintiffs' interest in OTS; and

(5)    A selective distribution of OTS funds would be made to enable

Costner, Smith and/or Westpac to acquire plaintiffs' interest in OTS.

Plaintiffs relied on Costner's statement, in Smith's presence, that there was "no

deal" with BP.  Further, they were unaware of Suttles other comments during his

June 7 meeting with Costner and Smith when they agreed to sell their interests in

OTS for $1.9 million.

### XLIVa.

The misleading statement and omission of fact by Costner, coupled with

Smith's silence at that time, were intentional actions made to derive financial gain

at plaintiffs' expense.  Upon information and belief, at the time of the June 8

breakfast meeting, discussions were already underway by which Smith and/or

Westpac, for their own behalf, and upon information and belief, by Smith as

Costner's agent on Costner's behalf, would acquire plaintiffs' interest in OTS.

Costner and Smith knew that a $52 million order from BP would result in a

substantial distribution to all members of OTS significantly in excess or the

proposed purchase price being paid to plaintiffs.  Costner and Smith knew that if

Contogouris and Baldwin were told that Suttles, the senior BP official charged

with day to day responsibility over the Deepwater Horizon spill, had said "we're

giving an order of 32," that they would not have sold their interests for only $1.9

million, particularly, where, as here, BP's order included an $18 million advance deposit that would make OTS self-funding and relieve Contogouris and Baldwin of any obligation to make a cash contribution to the business.  Defendants Costner, Smith and Westpac all received distributions out of the monies paid by BP which were proportionately greater than they would have been but for the sale of plaintiffs' interest in OTs.  Contogouris was shown a ledger on July 12 showing $8 million in distributions, including distributions to Costner, Smith and Westpac, and believes that further distributions were made later.

XLV.

Contogouris and Baldwin did not learn of the date of the BP purchase order, the terms thereof, or the creation of and wire transfers to and from the unauthorized OTS Rabobank account and WestPac until July 12, 2010.

XLVI.

Prior to the sale of plaintiffs' units in OTS, defendants Costner and Smith agreed to and schemed to make millions of dollars in selective distributions to themselves out of the monies paid as an advance deposit by BP, monies in which plaintiffs were entitled to also receive by distributions but for the misrepresentations and omissions of material fact made by Costner and Smith in the June 8, 2010 meeting at the Loew's Hotel and by their subsequent non-

28

disclosure to plaintiffs of the details of their meeting with Suttles.  Costner was

shown a Rabobank banking record in July, 2010 by Jouandot (the CFO of

Houghtaling's law firm, who maintained the records of OTS) indicating that some

$6 million in distributions were made to the members of OTS immediately after

the BP deposit was received.  All members, except Contogouris and Baldwin,

received distributions.

**FIRST CAUSE OF ACTION**

XLVIa.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j

declares, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce or of the mails, or of any
> facility of any national securities exchange [. . .]
>
> (b) To use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any security not so
> registered, or any securities-based swap agreement (as defined in section
> 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device
> or contrivance in contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

XLVIb.

The implementing regulation for this provision, which is commonly known

at Rule 10b-5, was promulgated at 17 C.F.R. §24010b-5, and provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

XLVII.

Plaintiffs plead the following in regard to the required elements of a Rule 10(b)(5) claim:

(a)     Material Misrepresentations and Omissions by the Defendants:

(1)     In response to a specific question from Contogouris as to whether or not OTS "had a deal" with BP, defendant Costner informed plaintiff Contogouris on the morning of June 8, 2010 at the Loew's Hotel in New Orleans that the meeting he attended with defendant Smith the previous evening with Doug Suttles, the COO of BP, resulted in a "no deal" but only a non-binding letter of intent;

30

(2)   In the context in which it was made, the statement "no deal" was either false, because Suttles had verbally committed BP to acquire 32 oil separation units from OTS by stating "we're giving an order for 32", or alternatively was misleading in that Costner failed to inform Contogouris that Suttles "would support" the transaction and had stated to Costner and Smith that he "had just as much vested here as you do."   Costner also failed to inform Contogouris that he believed Suttles when he made these statements;

(3)   Despite telling Contogouris on the morning of June 8, 2010 that there was "no deal," Costner told a Congressional subcommittee the following day that BP had placed an order for units;

(4)   Defendant Smith was present when Costner's statement of "no deal" was made, and did not correct it nor inform Contogouris of Suttles' other statements, i.e. "we're giving an order for 32", that he would support the transaction, and that he had just as much vested in the transaction as Costner did;

(5)    At no time prior to June 11, 2010, the date when plaintiffs

signed the agreement to transfer their membership interests,

did Smith or Costner inform Contogouris that BP had signaled

their intent to make an $18 million advance deposit, which

would make OTS self-funding and obviate the need for a cash

call from the members of OTS;

(6)    Smith, who is alleged to have been acting on his own and in

Costner and Westpac's behalf in acquiring plaintiffs'

membership interests, failed to disclose that he would not be

paying for plaintiffs' membership interests with his own funds,

but would be using OTS' funds received as part of the BP

advance deposit to acquire plaintiffs' interests for his own

behalf and on behalf of Costner and Westpac;

(7)    Costner's attorney and agent, Grigsby, reiterated to

Contogouris that no agreement with BP had been made on

June 9 or 10, and did not reveal details of the Letter of Intent

nor the comments made by Doug Suttles during the June 7

meeting held at Houghtaling's home;

(8)   When these false statements and /or omissions of material

fact were made, defendants Smith and Costner were acting on

their own individual behalf and on behalf of Westpac; and

(9)   Contogouris informed Baldwin of Costner's statement that "no

deal" had been made with BP shortly after it was made, and

also relayed to Baldwin the statement made by Houghtaling

that public statements made by Costner and Houghtaling that

an order had been placed were made to pressure BP and were

in fact not true.

(b)   Scienter on the Part of Defendants:

(1)   At the time of the June 8, 2010 meeting at the Loew's Hotel in

New Orleans, defendants Costner and Smith, both in their

individual capacity and on behalf of Westpac, knew that

discussions were underway for plaintiffs to convey their

membership interests in OTS;

(2)   Costner and Smith, both individually and in their capacity with

Westpac, knew that the proposed purchase price for the

membership interests was a fraction of what those interests

would be worth if BP in fact made an order for 32 of the oil

separator units;

(3)     As objective proof of this knowledge, during the June 8, 2010

meeting, Costner and Smith asked that Contogouris send a

draft of the purchase agreement to Costner's attorney, Dan

Grigsby, which he did;

(4)     Grigsby, Costner's agent and attorney in fact, drafted the

proposed sale documents, which provided Costner with at

least constructive knowledge of the proposed transaction;

(5)     Costner and Smith both insisted to Contogouris, even after

they knew that if BP made an order, it would include an $18

million advance, that Contogouris and Baldwin would be

required to make a cash contribution to the company or face

dilution of their shares;

(6)     Smith and Costner, both individually and as representatives of

Westpac, knew or should have known that plaintiffs would not

have sold their interest in OTS if they had known either that

Suttles had verbally committed to a purchase of 32 units, that

Suttles had said during the June 7 meeting held at

Houghtaling's Common Street home that he would support the

transaction, or that Suttles said "we're giving an order for 32,"

or Suttles said he "had as much vested here as you (Costner)

do;"

(7)     Although Smith acquired the membership interests in his name

per the purchase agreement, he was in truth and in fact also

acquiring plaintiffs' 38% interest or a portion thereof on behalf

of Costner, either directly or through Costner's ownership

interest in Westpac;

(8)     Smith, Costner and Westpac stood to make almost triple the

distribution that they would be entitled to from any profit

realized from the BP transaction by acquiring plaintiffs' 38%

membership interest;

(9)     Smith and Costner's agent, Grigsby, told Contogouris that

payment for plaintiffs' interest would be made by a 10% down

payment and a 90% payment a week later since Smith could

not immediately raise the cash due to a pending divorce

settlement; however,  this was false since nothing was

occurring in connection with Smith's divorce and Smith was

not the source of the money used to buy plaintiffs' interest, as

the BP advance to OTS was; and

(10)   Although he agreed to act as the celebrity spokesperson for

OTS in exchange for a 20% interest held by Westpac and a 15%

royalty, Costner repeatedly indicated he was being

undercompensated and needed to have a higher percentage of

the business.   He stated that "there was no business without

me" during several June conference calls to press his demand

for a higher percentage.  These comments exhibit a desire and

intent on Costner's part to increase his ownership percentage

in OTS.

(c)   A Connection between the Misrepresentation or Omission and the

Purchase or Sale of a Security: and

(d)   Reliance upon the Misrepresentation or Omission:

(1)   Plaintiffs' were aware that the acquisition cost from C.I.N.C. for

each of the 32 separator units was less than $500,000 per unit.

If BP purchased 32 of the units for $52 million, their 38% share

of the net profit from the sale would have been approximately

six times what they were being offered for their membership

interests;

(2)    Accordingly, had Contogouris been told by Costner and/or

Smith during the June 8, 2010 meeting at the Loew's hotel that

Doug Suttles had verbally committed BP to acquire 32 units for

$52 million, or that he, as the COO and point person for BP on

the Deepwater Horizon spill "would support" the transaction,

had as much "vested here" as Costner did, or that "we're

giving an order for 32," plaintiffs would not have sold their

interest in OTS on June 11, 2010 for $1.9 million;

(3)    It does not make economic sense for any interest holder under

circumstances where the COO of one of the largest

corporations in the world had committed to or was strongly in

support of a transaction to sell their interest for $1.9 million

when that interest would be worth $12 to $15 million if the

transaction would be consummated, particularly where, as

here, the transaction was self-funding as the customer would

be advancing the funds ($18 million) necessary to acquire the

separation units;

(4)     Contogouris and Baldwin both relied upon Costner's "no deal"

        statement in agreeing to sell their interest in OTS for $1.9

        million, as well as Grigsby's confirmation of this as Costner's

        agent the next day;

(5)     Contogouris and Baldwin were justified in relying on this "no

        deal" statement since they were told by an attorney and

        officer of the court, Houghtaling, who owed them a fiduciary

        duty, that public statements that BP had committed to an

        order were false and made to pressure BP into making a

        transaction; and

(6)     Contogouris and Baldwin were justified in relying on Costner's

        "no deal" statement as BP had not issued a statement

        confirming a deal had been made prior to June 11, 2010 when

        they agreed to sell their interest as finalized on June 18, 2010;

        and

(7)     Neither Contogouris nor Baldwin would have sold their

        interest in OTS if either had known that OTS's funds, received

        as part of the BP $18 million advance deposit, would be used

        to acquire their membership interest in OTS;

(8)   Plaintiffs relied on the false statement in the Purchase

Agreement for their interests that the units would be acquired

with personal funds belonging to Smith, and that the payment

in full for the interests would be delayed by Smith's divorce

settlement, both of which were false;

(9)   Plaintiffs would not have sold their interest if they had been

told that no cash call would be needed as BP's advance deposit

would make OTS self-fudning; and

(10)  The connection between the failure to disclose OTS as the

source for the monies used to acquire plaintiffs' interest in OTS

and plaintiffs' willingness to sell their interest is that no

reasonable investor would agree to sell his or her interest in a

company in exchange for funds that they otherwise would be

due by way of a distribution or dividend under the terms of the

Operating Agreement governing the management of the

company.

(e)   Economic Loss:

(1)   Plaintiffs have been damaged in a number of ways by the misrepresentations and/or material omissions of Costner and Smith, both individually and on behalf of Westpac;

(2)   First, they were induced to sell their shares for a fraction of their value;

(3)   The sale of the separator units to BP generated an estimated profit to OTS of $38 million.  As a 28% owner of OTS, Contogouris' share of the profit from the sale would have been approximately $10.64 million, and he only received $1.4 million for his interest due to the misrepresentations and/or material omissions delineated.  He has therefore been damaged in an amount which will be proven at trial hereof, but which is estimated at $9.2 million;

(4)   As a 10% owner of OTS, Baldwin's share of the profit from the sale to BP would have been approximately $3.8 million, and he only received $500,000 for his interest in the company.  He has therefore been damaged in an amount to be shown at trial hereof, but which is estimated to be $3.3 million;

(5)     In the alternative, plaintiffs have been damaged to the extent

they as holders of membership units in OTS on the date of the

BP advance deposit would have been entitled to share in

distributions made out of the advance deposit made by BP;

and

(6)     In the alternative, and at a minimum, by reason of the

unlawful conversion of OTS' funds in the amount of $1.9

million which was used to acquire plaintiffs' interest, plaintiffs

have been damaged to the extent of 38% of that amount, or

some $722,000.00.

(f)     Loss Causation in Connection with the Sale of a Security:

(1)     There is a causal connection between the economic loss

sustained by plaintiffs' and the misrepresentations and/or

omissions of material fact for the reasons set forth above in

this Article XLIX subsections (c) and (d).

XLVIII.

As alleged above, although the purchase agreement nominally conveyed

plaintiffs' interest to Smith, plaintiffs allege that Smith was acquiring their interest

for his own benefit as well as the benefit of Costner and Westpac.  As objective

41

evidence of this, plaintiffs show that the monies used to acquire their interest were paid from Westpac's bank account after those funds were wired to that account from the unauthorized account set up in OTS' name at Rabobank.

### XLIX.

By telling Contogouris during the June 8 breakfast meeting that no deal was reached with BP, or alternatively by failing to disclose Doug Suttles' verbal agreement to purchase units from OTS, Suttles' support for the purchase, or Suttles' vested interest in seeing the purchase was made, Costner, Smith and Westpac were able to obtain plaintiffs' interest in OTS for a fraction of their value. Collectively, Costner, Smith and Westpac increased their ownership interest in OTS from 20% to 58%, thus effectively tripling the amount they were entitled to receive out of the profits of OTS from the $52 million sale to BP.  The economic advantage of these misrepresentations and non-disclosures to defendants was on the order of $14-$15 million.

### XL.

The allegations set forth in Article XLIX are specifically alleged to comply with the Fifth Circuit's requirement that the pleading set forth: (a) each statement or omission alleged to have been misleading; (b) identifies the speaker; (c) states when and where the statement was made; (d) pleads with particularity the

content of the false representations; (e) pleads with particularity what the person

making the representation obtained thereby; and (f) explains why the statement

is misleading.

XLI.

With respect to the PSLRA pleading requirements for an action under Rule

10(b)(5), plaintiffs aver:

    (a)    Each Statement alleged to have been Misleading, and the Reason

        why the Statement is Misleading (15 U.S.C. 78u4(b)(1)(B)):

        (i)    Costner, in Smith's presence, told Contogouris, who relayed

        the information to Baldwin, on June 8, 2010 at the Loew's Hotel that

        "no deal" was made in the June 7, 2010 meeting with BP: this

        statement was misleading in that Suttles in fact verbally committed

        to make a purchase, or at least said "we're giving an order for 32"

        was misleading in that Suttles, as the COO of BP and the point person

        for BP on the Deepwater Horizon spill, expressed his strong support

        for the purchase and that he had just as much vested in the purchase

        and sale of separator units as did the representatives of OTS;

        (ii)    Smith's statement in the Purchase Agreement for plaintiffs'

        interest that he would be paying for plaintiffs' membership interests

in OTS was false and misleading since the monies used to buy

plaintiffs' interest in fact came from the $18 million advance deposit

made by BP; and

(iii)    Neither Smith nor Costner advised plaintiffs that BP had

agreed to or at least had signaled its intent to make an $18 million

advance deposit, and this omission was misleading in that plaintiffs

were told and were still operating under the belief they would be

asked to contribute cash to the operations of OTS as Costner and

Smith had repeatedly indicated a cash call from investors would be

necessary to capitalize OTS.

(b)    State with Particularity Facts giving rise to a Strong Inference that

Defendant acted with the Required State of Mind (15 U.S.C.

§78u4(b)(2)):

(i)    In response to a specific question from Contogouris as to

whether there had been a "deal" reached, Costner, in Smith's

presence, told Contogouris "no";

(ii)    Neither Costner nor Smith informed Contogouris of Suttles'

other comments regarding his support for and vested interest in the

transaction, nor his statement "we're giving an order for 32";

44

(iii)    At the time of this June 8, 2010 Loew's hotel meeting, discussions were underway for Westpac, in which Costner and Smith held ownership interests, or Smith, who was represented to be the agent and business manager for Costner in Costner's dealings with OTS, to acquire plaintiffs' membership interest for a fraction of what they would be worth if BP in fact purchased the separator units;

(iv)    Costner and Smith had repeatedly told Contogouris and Baldwin that a cash call from investors in OTS would be necessary, yet failed to tell them that the "deal" or the letter of intent with BP called for an $18 million advance deposit;

(v)    Smith represented in the Purchase Agreement, on his behalf and on behalf of Costner and Westpac, that their own funds would be used to acquire plaintiffs' interest in OTS, yet OTS' funds were converted without appropriate company approval for the purpose of acquiring plaintiffs' interest in OTS;

(vi)    Costner and Smith had repeatedly asked Contogouris during June conference calls of the OTS investors to give Westpac and/or Costner a higher percentage of ownership in OTS in exchange for Costner's continued public and private promotion of a sale to BP;

45

(vi)    As a consequence of obtaining plaintiffs' membership interests, defendants were able to almost triple the amount of distributions they were entitled to from OTS, or an additional $14-15 million; and

(vii)   Costner, Smith and Westpac financially gained from their actions as Contogouris has seen a ledger showing that at least $8 million in distributions were made to the members of OTS, with the bulk going to Costner, Smith and Westpac, prior to July 12, and they therefore received more than they would have received had plaintiffs retained their 38% ownership interest in OTS.

### LII.

Neither Contogouris nor Baldwin exercised control over OTS under the terms of the Operating Agreement governing the operation of OTS.  The Operating Agreement required a supermajority vote of 60% of the membership in order to take actions on behalf of the company.  The membership interests held by plaintiffs in OTS constituted an "investment contract" and a security under federal law.  15 U.S.C. 78c(a)(10)

LIII.

These misrepresentations were made by defendants through the use of instrumentalities of interstate commerce, such as interstate telephone lines, facsimiles between states, and or e-mails sent interstate.  Literally dozens of emails and facsimiles were exchanged between plaintiffs and defendants between June 10 and June 18, 2010 discussing the terms of the arrangement. Funds were wired between states using instrumentalities of interstate commerce as part of the scheme to defraud plaintiffs.

LIV.

Accordingly, defendants submit that for the reasons stated, defendants Costner, Smith and Westpac have violated Rule 10(b)(5) and are liable to them for the damages described herein or such other damages as may be reasonable in the premises.

## SECOND CAUSE OF ACTION

LV.

Plaintiffs repeat and re-aver the allegations of the First Cause of Action and the factual allegations set forth previously in this First Amended Complaint as if set forth in their entirety herein.

LVI.

Article 1949 of the Louisiana Civil Code declares that error vitiates consent

when it concerns a cause without which the obligation would not have been

incurred and that cause was known or should have been known to the other

party.

LVII.

Plaintiffs were operating under the mistaken belief that their membership

interests in OTS would be purchased with funds held by Smith and/or WestPac

rather than with funds properly belonging to OTS.   Defendants knew, or should

have known, that plaintiffs never would have sold their interest in OTS had they

known that OTS' funds which otherwise would have been distributed to plaintiffs

would be used to purchase their interests in OTS.  Plaintiffs were also unaware

that Doug Suttles of BP had stated to Costner and Smith, as the BP senior

executive charged with cleaning up the Deepwater Horizon Spill, that "we're

giving an order of 32,"  or alternatively had made a firm and binding commitment

from BP to purchase 32 units prior to the sale of their membership interests.

LVIII.

These errors vitiated plaintiffs' consent to sell their interests in OTS to

WestPac and/or Smith.  Plaintiffs are entitled to a recission of the transfer of their

ownership interest in OTS together with damages equal to the amount of the

distribution that would have been paid to plaintiffs had they remained members

of OTS owning 28% and 10% respectively from June 18, 2010 to present, or such

other reasonable compensation as may be due plaintiffs.

LIX.

Although the purchase agreement for plaintiffs' interest in OTS did not

nominally sell that interest to Costner, plaintiffs aver upon information and belief,

and based on representations made to them that Smith was acting for Costner

and Westpac, and that Costner was an owner of Westpac, that Costner, either

directly or indirectly, obtained beneficial ownership of plaintiffs' interest in OTS.

The assignment executed by Contogouris and Baldwin transferred their interests

in OTS to "Smith or his designee," which Contogouris and Baldwin always believed

was Costner.  To the extent Costner directly acquired ownership of that interest,

either by counter-letter or otherwise, plaintiffs' also seek recission against

defendant Costner.  Plaintiffs also seek such damages as may be available to

them, as described previously herein, from each defendant, including Costner,

pursuant to Louisiana law.

## THIRD CAUSE OF ACTION

LX.

Plaintiffs adopt and re-aver the allegations of the First and Second Causes of Action and the factual allegations set forth previously in this First Amended Complaint as if set forth in their entirety herein.

LXI.

Article 1948 of the Louisiana Civil Code declares that fraud is one of the bases for vitiating consent.

LXII.

Article 1953 of the Louisiana Civil Code declares that fraud may result from either misrepresentation or from silence.

LXIII.

The actions of Costner, Smith and Westpac, as detailed herein, including the use of OTS funds to acquire plaintiffs' interest in OTS, the misleading statement that there was "no deal" with BP, the failure to disclose other comments made by BP official Doug Suttles, constituted fraud.  If those funds were transferred from OTS to Smith or WestPac as a distribution, then plaintiffs would also have been entitled to a distribution in the amount of $3.8 million.  At no time did defendants represent that the funds used to acquire plaintiffs'

interest in OTS would be anything other than funds belonging to Pat Smith,

WestPac or from third party funds secured by a lender who did not receive

security in property not then belonging to defendants.  However, is precisely what

occurred, all constituting fraud.

LXIV.

Costner's statement that there was "no deal", and both Smith and

Costner's omission of facts related to other comments regarding the transaction

made by BP, the details of the letter of intent, and to the extent defendants knew

they had a firm commitment from BP to purchase separators from OTS, and told

plaintiffs that they did not, such omission of a material fact constituted fraud.

LXV.

By reasons of defendants' fraud, plaintiffs are entitled to recission of the

sale of their membership interests in OTS, and further entitled to receive all

dividends or distributions that would have been made to them as 38% owners of

OTS from June 11, 2010 to the present, or such other reasonable compensation as

may be due them.

FOURTH CAUSE OF ACTION

LXVI.

Plaintiffs aver upon information and belief that the policies and procedures of Rabobank, N.A. require that for a limited liability company to open a checking account, the limited liability company must submit signatures from all members to authorize the creation of the account, a copy of the articles of organization, and a copy of the LLC operating agreement.

LXVII.

Plaintiffs aver that Rabobank improperly and negligently opened the account from which the wires were sent to acquire plaintiffs' interest in OTS because a majority of the members did not authorize creation of the account and since Rabobank did not follow its own policies and procedures in permitting this account to be opened.

LXVIII.

Plaintiffs aver that the negligence of Rabobank in opening the account facilitated the fraud perpetrated by one or more of the other defendants, in that it permitted the funds of OTS to be converted to private use in order for Smith, Costner and Westpac to acquire plaintiffs' membership interests in OTS.  Plaintiffs further aver that the wire transfers sent from the OTS account to acquire their

52

membership interests were not properly authorized by the LLC, and Rabobank

negligently participated in the conversion of OTS funds to private use by one or

more of the other defendants.

LXIX.

As a result of the aforesaid negligence on the part of Rabobank, N.A.,

including its unauthorized transfers from the OTS account, plaintiffs have been

damaged in an amount equal to what they would have received from their

ownership in OTS but for the negligent and unauthorized use of OTS funds

facilitated or caused by the negligence of defendant Rabobank, N.A.

LXX.

Plaintiffs reserve the right to amend this cause of action to include any

other unauthorized transfers from the Rabobank account that are uncovered

during the course of discovery in this action.

FIFTH CAUSE OF ACTION

LXXI.

At all times pertinent, defendants Smith and Costner were acting as agents

or representatives of Westpac.

LXXII.

Under principles of agency law, Westpac is vicariously liable for the misrepresentations, false statements, conversions of money, unauthorized distributions, and material omissions made by defendants Costner and Smith, and all damages caused to plaintiffs as a result thereof.

SIXTH CAUSE OF ACTION

LXXIII.

Defendant Costner clothed defendant Smith and his attorney, Daniel Grigsby, with apparent authority to act on his behalf in connection with his dealings with OTS and its members.

LXXIV.

Defendant Smith and Grigsby were acting as agents and authorized representatives, or at least within the scope of their apparent authority, in their dealings with plaintiffs.

LXXV.

Since Smith and Grigsby were acting as authorized agents of Costner, or acting within the scope of their apparent authority in their dealings with plaintiffs and OTS, Costner is vicariously responsible for the misrepresentations, false statements, conversions of money, unauthorized distributions, and material

54

omissions made by defendant Smith and attorney Grigsby, and all damages caused to plaintiffs as a result thereof.

WHEREFORE, plaintiffs' pray:

(1)   That process in due form of law may issue, citing defendants to appear and answer within the delays provided by law;

(2)   After due proceedings are had, that there be judgment in plaintiffs' favor, and against defendants, either individually or *in solido*, awarding plaintiffs such damages and relief that may be equitable in the premises, including but not limited to the actual reasonable value of their interest in OTS, or recission of the sale of their interests in OTS together with payment of such distributions or dividends from OTS as would have been made to them from June 11, 2010 to the present; and

(3)   With respect to defendant Rabobank, N.A., awarding plaintiffs such damages as may have been caused by their negligence or unauthorized transfer of OTS funds; and

(4)   For all other and further relief, including interest, costs, and attorneys' fees, that plaintiffs may be entitled to receive.

Respectfully submitted this 22nd day of Feburary, 2011.

WAITS, EMMETT & POPP

*s/Randolph J. Waits*
RANDOLPH J. WAITS, T.A. (La. 13157)
JOHN F. EMMETT (La. 1861)
MATTHEW F. POPP (La. 24608)
1515 Poydras Street, Suite 1950
New Orleans, Louisiana   70112
Telephone:  (504) 581-1301
Telecopier:  (504) 585-1796

KING, KREBS & JURGENS, PLLC

*s/Timothy S. Madden*
HENRY A. KING (La. 7393)
TIMOTHY S. MADDEN (La. 21733)
MONICA J. MANZELLA (La. 29965)
4500 Place St. Charles
201 St.Charles Avenue
New Orleans, Louisiana   70170
Telephone:  (504) 582-3800
Telecopier: (504) 582-1233
Attorneys for Spyridon C. Contogouris and
          Stephen A. Baldwin

PLEASE SERVE:
ALL DEFENDANTS
Through their attorneys of record

C E R T I F I C A T E   O F   S E R V I C E

I hereby certify that a copy of the foregoing has been served on all counsel of record by depositing same in the United States mail, postage pre-paid and properly addressed, or by filing same using the Court's electronic filing system, or by other means, such as facsimile or electronic mail, on this 22nd day of February, 2011.

*s/Randolph J. Waits*