UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SPYRIDON CONTOGOURIS, ET AL                CIVIL ACTION

VERSUS                                     NO. 10-4609

WESTPAC RESOURCES, LLC, ET AL              SECTION "F"

<u>ORDER & REASONS</u>

Before the Court are the motions of Rabobank, Kevin Costner, WestPac Resources, LLC, and Patrick N. Smith to dismiss plaintiffs' first amended complaint.  For the following reasons, Rabobank's motion is GRANTED; Costner's motion and WestPac and Smith's motion are DENIED.

**<u>Background</u>**

This case arises out of a marketing agreement inspired in the wake of the Deepwater Horizon oil spill.  Despite its initial success, it soon soured.

The details of this case are ample, yet still seem to be emerging.  At some time in the 1990s, Kevin Costner, through his corporation C.I.N.C., Inc., financed and oversaw the development of technology which could separate oil from water.  Toward the beginning of the 2000s, Costner coordinated with Spyridon Contogouris, a New Orleans-area resident, to market the technology and the separation device which implements it.  Contogouris and C.I.N.C. entered into an agreement under which Contogouris would receive a commission for any units he sold.  It is unclear how long

1

this agreement was to endure.

Flashforward to Spring 2010. Contogouris and his family met Costner for a meal on April 17, 2010 in Biloxi, Mississippi. Costner told Contogouris that he had sold his rights to the separator technology and his ownership stake in C.I.N.C. to Bret Sheldon after attempts to market the oil-separation system were not successful. Providentially, only three days later, a now-infamous drilling rig called Deepwater Horizon exploded. The result: a catastrophic oil spill that saturated much of the Gulf of Mexico.

In the first days of the spill, Contogouris claims that contacts within the oil-and-gas industry revealed to him the extent of the catastrophe before it was public knowledge; he quickly recognized a significant opportunity for C.I.N.C. and himself. He first tried to reach Costner to discuss marketing the technology for its use in the unfolding clean-up effort. When that was unsuccessful, Contogouris contacted Sheldon and C.I.N.C. directly to discuss obtaining an exclusive agreement to acquire the units for use in the Gulf of Mexico region. It is unclear what came of that conversation.

Unsuccessful in his attempts to approach BP directly, Contogouris determined that he would need to bring in partners who could lend assistance in gaining access to BP. He formed a joint-venture agreement, which eventually transformed into a partnership under the name of Ocean Therapy Solutions, LLC (OTS), comprising

the following people and entities, some based in Louisiana, some not:  Stephen Baldwin, John Houghtaling, Patrick Smith, WestPac Resources, LLC (an organization in which both Costner and Smith owned shares), and L&L Properties (an entity formed by WestPac together with locals Frank Levy and Franco Valobra).  OTS quickly accomplished a threshold goal:  On May 3, 2010, OTS and C.I.N.C. entered into a marketing agreement, granting OTS exclusive rights to market the oil-separation system in the Gulf of Mexico.

By May 10, 2010, Contougoris registered OTS with the Louisiana Secretary of State.  An operating agreement soon resettled and established their ownership stakes as follows:  Contougoris, 28 percent; Baldwin, 10 percent; Houghtaling, 21.5 percent; Valobra, 5 percent; L&L Properties, 15.5 percent; and WestPac, 20 percent. The agreement required a 60 percent super-majority for OTS to take any action.  From this point through his withdrawal from OTS, Contogouris asserts that he was OTS's "first founding member, managing member, and largest shareholder."  Levy was installed as OTS's CEO.

OTS soon suffered from internal disagreement and distrust among its membership.  On the one hand, Contogouris, holding the largest stake in OTS, and Levy, OTS's CEO, wanted the company to use a business model which would insure recurring business and the possibility of marketing the device to other major oil companies. They proposed renting units to BP at a fair price in a long-term

agreement.   Houghtaling and Smith, together representing 41.5 percent of total shares, on the other hand, favored a less complicated approach involving a one-time sale of the equipment to BP at a higher price.  As a result of this disagreement (along with a separate conflict between Levy and Hougtaling), Levy withdrew from OTS, conveying all his shares to Houghtaling.   Houghtaling took Levy's place as CEO and eventually transferred Levy's share to Costner.

At the same time, Contogouris and Smith began to clash. Beginning in late May, Costner and Smith allegedly told Contogouris and Baldwin that they needed to each make a $1.14 million cash contribution to fund OTS's operation without explaining why. Contogouris agreed to raise part of this money, but insisted upon being told to what uses the cash would be put.  The explanation never came.  Eventually, Smith notified Contogouris and Baldwin that if they did not respond to the cash call, their shares would be diluted.  Alternatively, Smith and/or WestPac proposed to buy Contogouris's and Baldwin's shares for $1.4 million and $500,000, respectively.  (Contogouris alleges that these interests were to be acquired for Costner's benefit.)  Fueling their conflict was Contogouris's growing suspicion that Costner and Smith were trying to maximize their own profit, by hoodwinking Contogouris and Baldwin into selling their shares while at the same time finalizing an undisclosed deal with BP.  Contogouris contends that he felt

4

added pressure because Costner and Smith were in the position to force a cash call because they now had the support of Houghtaling and Valobra; collectively, they had the needed sixty-percent super-majority called for in the operating agreement. (None of these people or the entities they represented, however, independently held the necessary share to form a super-majority.)

From an outsider's perspective, however, BP had not yet been particularly responsive to OTS. OTS members pressed forward with promoting the technology through the media and Costner's appearance before Congress to discuss the technology and his efforts to have BP employ it to help deal with the oil spill. These outreach efforts seemed to have their desired effect: Before Costner testified, BP agreed to meet with OTS members at Houghtaling's house and signed a letter of intent to purchase several units of the device. Contogouris claims he was excluded from this meeting at the last minute; only Houghtaling, Smith, and Costner were present to advocate OTS's interests. The next morning, when Baldwin and Contogouris asked Costner about his meeting with BP, Costner allegedly denied that they had reached a binding deal, responding only that a non-binding letter of intent had issued. Contogouris and Baldwin suspected that something resembling a binding deal had in fact been reached. Contogouris further complains that no one told him that the letter of intent would make OTS self-funding, possibly obviating the need for any investor cash

contributions to the company.

Costner testified before Congress on June 9, 2010 and announced that BP had placed an order for the technology. Costner reiterated to the press his statement that BP had placed an order. Contogouris attempted to contact Costner without success. Costner's attorney allegedly relayed to Contogouris that no deal had been reached with BP and hoped public pressure would cause BP to yield to a binding agreement. It is clear from the complaint, however, that Contogouris knew of the likelihood of a binding deal by June 8. That same day, because of continued demands for a cash contribution without sufficient explanation of the use to which it would be put—and perhaps due in part to Costner's (alleged) unraveling pattern of untruths—Contogouris made a trip to Los Angeles to sell his interests.

The original proposed agreement called for WestPac and/or Smith to pay the purchase price of $1.9 million ($500,000 of which represented Baldwin's share) upon execution of the agreement. But by June 10, Smith sought to change the payment terms, offering to pay a ten percent deposit by the next day, followed by the remaining payment a week after that. It appears Contogouris had no objection to this arrangement at the time. But Contogouris alleges now that Costner, Smith, and WestPac orchestrated a nefarious scheme to acquire Contogouris's and Baldwin's interests without having to pay any cash of their own, simultaneously depriving

Contogouris and Baldwin of their share of any profits from BP; as the story goes, Costner, Smith, and WestPac scrambled to acquire Contogouris's and Baldwin's interests knowing that BP soon would pay an $18 million deposit to OTS; they would use part of BP's deposit to buy the shares.

The ten percent deposit reached the Contogouris and Baldwin bank account through a transfer from WestPac's account with Rabobank, N.A. in California on June 11, 2010, as promised. The next day, BP executed a purchase agreement with OTS for thirty-two units. The gross price was over $52 million; BP promised to make an advance deposit of $18 million and publicly announced the deal on June 15, 2010.

Rather than arrange for a deposit to an account already opened by Contogouris for OTS in Louisiana, a different bank account was opened in OTS's name at Rabobank in California, apparently without Houghtaling's, Contogouris's, or Baldwin's knowledge or authorization. It was into this unauthorized account that BP paid its $18 million deposit on June 16. All members of OTS received a distribution. All except Baldwin and Contogouris. Baldwin and Contogouris claim that at the time the $18 million deposit was made, they were still members of OTS and thus entitled to a distribution because full payment for their surrendered interests was still pending (even though they reached a final agreement to sell their interests before the deposit was made).

That same day, Smith e-mailed Contogouris to let him know that "he had the cash" and was prepared to close on the sale of Contogouris's and Baldwin's interests.  On June 18, 2010, payment was complete:  OTS transferred funds from its Rabobank account to WestPac's Rabobank account, and then transferred from the WestPac Rabobank account to Contogouris and Baldwin.  The parties signed documents to finalize the transfer.

Alleging a federal securities claim and other claims arising under Louisiana state law, Contogouris and Baldwin have sued Costner, Smith, WestPac, and Rabobank.

Rabobank moves for dismissal based on lack of personal jurisdiction.  Rabobank, Costner, WestPac, and Smith also move to dismiss the claims against them for the failure to state a claim. The Court resolves the jurisdictional question first.

## Law & Analysis

### I.

When a nonresident like Rabobank moves to dismiss for lack of personal jurisdiction, the plaintiffs seeking to invoke the jurisdiction of this Court bear the burden of establishing it. See Luv N' Care v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006). The plaintiffs may meet their burden by presenting a prima facie case for personal jurisdiction where, as here, the Court decides the matter without an evidentiary hearing. Wilson v. Belin, 20 F.3d 644, 648 (5th Cir. 1994).  The Court will take all

uncontroverted allegations in the complaint as true and resolve any conflicts in the plaintiff's favor.  Id.  The Court is not restricted to pleadings, but may consider affidavits, interrogatories, depositions, or any other appropriate method of discovery.[1]  Id.; see Jobe v. ATR Marketing, Inc., 87 F.3d 751, 752 (5th Cir. 1996).

The Court may exercise personal jurisdiction over a nonresident defendant only if two requirements are satisfied:  (1) the forum state's long-arm statute confers personal jurisdiction; and (2) the exercise of jurisdiction does not exceed the boundaries of Due Process.  See Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 270 (5th Cir. 2006).  Because the limits of Louisiana's long-arm statute are co-extensive with the limits of constitutional due process, the inquiry is simply whether this Court's exercise of jurisdiction over the defendants would offend due process.  See La. R.S. 13:3201(B); Luv N' Care, 438 F.3d at 469; see also Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867, 871 (5th Cir. 1999).

The Due Process Clause limits the Court's power to assert personal jurisdiction over a nonresident defendant.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14 (1994). That is, a nonresident defendant must have meaningful minimum

---

[1]  Here, in addition to the amended complaint, the Court considers the affidavit of Margaret Castle, Rabobank's Assistant Vice President.

"contacts, ties, or relations" with the forum state in order for jurisdiction to be constitutional.  See Luv N' Care, 438 F.3d at 469 (citing Int'l Shoe Co. v. Wash., 326 U.S. 310, 319 (1945)). The minimum contacts analysis asks whether the nonresident defendant purposefully availed himself of the benefits and protections of the forum.  Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994).

The minimum contacts test takes two forms, and the constitutional limitations on the exercise of personal jurisdiction differ depending on whether a court seeks to exercise general or specific jurisdiction over the defendant.  Regardless of whether the lawsuit is related to the defendant's contacts with the forum, courts may exercise general jurisdiction over any lawsuit brought against a defendant that has "continuous and systematic general . . . contacts" with the forum state.  See Seiferth, 472 F.3d at 271 (citing Helicopteros Nactionales de Colombia, S.A. v. Hall, 466 408, 413-14 (1984)).  "If", on the other hand, "a defendant has relatively few contacts, a court may still exercise specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'"  Id.  General jurisdiction focuses on incidents of continuous activity within the disputed forum; specific jurisdiction is more constrained by virtue of a very limited nexus with the forum.  When a defendant has a strong relationship to the litigated claim and the claim has a strong

10

relationship with the forum, the Court will have specific jurisdiction.

General jurisdiction is plainly lacking.  From the facts pled and issues briefed to this Court, Rabobank lacks any presence in Louisiana, and the only potential nexus for jurisdiction is the dispute underlying this case.[2]  Whether this Court may exercise jurisdiction over Rabobank depends on whether the plaintiffs have established this Court's specific jurisdiction.

A.

The Court may exercise specific jurisdiction over a defendant who has "minimum contacts" with the forum state if maintaining the suit would not "offend traditional notions of fair play and substantial justice."  See Luv N' Care, 438 F.3d at 469 (citing Int'l Shoe Co. v. Wash., 326 U.S. at 319).  Specific jurisdiction exists when the plaintiff shows that the defendant has purposely directed its activities toward the forum state and that its cause of action arises out of or results from the defendant's forum-related contacts.  Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) and Nuovo Pignone v. STORMAN ASIA M/V, 310 F.3d 374 (5th Cir. 2002)) (internal quotation marks omitted).  Once the plaintiff makes this preliminary showing, personal jurisdiction

---

[2]  The plaintiffs incorrectly urge that general jurisdiction lies based on Rabobank's recent online publication of a report, "U.S. Cotton Outlook Encouraging," which discusses the viability of major cotton-growing regions, including Louisiana.

11

will lie unless the defendant can show that the exercise of jurisdiction would be unfair or unreasonable.  <u>Id.</u>

B.

1.

Rabobank asserts that the exercise of personal jurisdiction over it is improper because it has no presence here, no registered agent in Louisiana, and conducts no business in Louisiana; none of the alleged unauthorized banking transactions occurred in Louisiana and could not have been reasonably anticipated to have effects in Louisiana.  Virtually all activity involving Rabobank occurred in California.

The plaintiffs assert that Rabobank has sufficient minimum contacts within Louisiana based on the facts that OTS is registered in Louisiana, and payments were made from OTS's account to Louisiana residents; that the harm to Louisiana residents radiated from California.

2.

The Fifth Circuit U.S. Court of Appeals has held that "[f]oreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum." <u>Wien Air Alaska, Inc. v. Brandt</u>, 195 F.3d 208, 213 (5th Cir. 1999).  Instead, a defendant's minimum contacts with the forum state must form the basis for the claim.  <u>Id.</u>

Here, the plaintiffs' claim against Rabobank arises entirely

12

out of foreign activities; specifically, plaintiffs allege that
Rabobank, a California bank, violated its own procedures by
allowing certain OTS members to open a bank account in California
without the knowledge or permission of other OTS members.  From
these facts, aside from being unclear that any injury to the
plaintiffs was foreseeable, the connection to Louisiana is
attenuated at best to the injury claimed and insufficient to show
that this Court's exercise of personal jurisdiction over Rabobank
is proper.

Furthermore, the plaintiffs allege only one conceivable
connection between Rabobank and Louisiana:  two wire transfers
initiated in California, directed at the request of account-holders
toward Louisiana residents.  Although these transfers are not at
the center of the plaintiffs' claim against Rabobank, even if they
were, they would not be enough to confer specific jurisdiction over
Rabobank in Louisiana.  In <u>Smith Stag, LLC v. Wilson & Meyer Custom
Theater Interiors, LLC</u>, 6 So.3d 921, 924 (La. App. 4 Cir. 2009),
for example, a Louisiana appellate court found that there was no
personal jurisdiction over an out-of-state bank that received a
transfer from a Louisiana bank, and then transferred those funds at
the request of an out-of-state account-holder, assisting that
account-holder's fraudulent purposes through the transfer.
Compelling to the state court, however, was the fact that neither
the account-holder nor the bank had any contacts to the forum

state.

Similarly, in <u>Calahan v. Haspel</u>, 732 So.2d 796, 799 (La. App. 3 Cir. 1999), another Louisiana court determined that the renters of a home were not subject to personal jurisdiction based on their rental of an out-of-state property when the renters simply paid rent by mail, delivery service, and wire transfers to the property owners who lived in Louisiana.   The residency of the property owners was "merely fortuitous."   <u>Id.</u>

In light of Rabobank's solely passive role and its lack of other contacts with Louisiana, an exercise of specific jurisdiction is improper.   See <u>My Favorite Year, Inc. v. Kiosk Building Associates, L.P.</u>, No. 90-2155, 1991 WL 33583, at *3 (E.D. La. Mar. 4, 1991) (finding no personal jurisdiction over a non-resident when the plaintiff entered the non-resident's jurisdiction and initiated acts giving rise to the alleged injury).   Accordingly, the minimum contacts necessary to sustain this Court's exercise of jurisdiction over Rabobank are not present.[3]

Finding no basis for personal jurisdiction, the Court GRANTS Rabobank's motion to dismiss and turns to the WestPac, Smith, and

---

[3]   The plaintiffs urge the Court to find personal jurisdiction under the <u>Calder</u> line of cases.   <u>Calder</u>'s application is limited to cases in which "allegedly tortious acts . . . were expressly aimed at the forum state and the nonresident defendants knew that their acts would have an impact on the plaintiff in the forum state." <u>Allred v. Moore & Peterson</u>, 117 F.3d 278, 286 (5th Cir. 1997).   There is nothing here to suggest this standard is satisfied.

Costner motions to dismiss.

## II.

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted.  Such a motion "'is viewed with disfavor and is rarely granted.'"  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks omitted).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1940.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks, citations, and footnote omitted).

The United States Supreme Court suggests a "two-pronged

approach" to determine whether a complaint states a plausible claim for relief.  _Iqbal_, 129 S. Ct. at 1950.  First, the Court must identify pleadings that are conclusory and thus not entitled to the assumption of truth.  _Id._  A corollary: legal conclusions "must be supported by factual allegations."  _Id._  Second, for those pleadings that are more than merely conclusory, the Court assumes the veracity of those well-pleaded factual allegations and determines "whether they plausibly give rise to an entitlement to relief."  _Id._

This facial plausibility standard is met when the plaintiff pleads facts that allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  _Id._ at 1949.  Claims that are merely conceivable will not survive a motion to dismiss; claims must be plausible.  _Twombley_, 550 U.S. at 570; _see_ _also_ _Iqbal_, 129 S. Ct at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully").  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  _Iqbal_ 129 S. Ct. at 1949 (internal quotations omitted).  In the end, evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  _Id._ at 1950.

Rule 9(b) of the Federal Rules of Civil Procedure additionally requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The particularity requirement of Rule 9(b) extends to breach of fiduciary duty claims predicated on fraud.  <u>Brown v. Bilek</u>, 401 F. App'x 889 (5th Cir. 2010); <u>see</u> <u>Williams v. WMX Techs., Inc.</u>, 112 F.3d 175 (5th Cir. 1997). Generally "the Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent," <u>Plotkin v. IP Axess Inc.</u>, 407 F.3d 690, 696 (5th Cir. 2005), but "[w]hat constitutes 'particularity' will necessarily differ with the facts of each case." <u>Guidry v. Bank of LaPlace</u>, 954 F.2d 278, 288 (5th Cir. 1992) (quoting <u>Unimobil 84, Inc. v. Spurney</u>, 797 F.2d 214, 217 (5th Cir. 1986)).  Rule 9(b)'s requirements apply whether a fraud claim arises out of federal or state law.  <u>See, e.g.</u>, <u>Sullivan v. Leor Energy, LLC</u>, 600 F.3d 542, 550-51 (5th Cir. 2010) ("State law fraud claims are subject to the heightened pleading requirements of Rule 9(b).").

Finally, claims asserted under Section 10(b) and Rule 10b-5 of the Securities Exchange Act must meet the pleading requirements of the Private Securities Litigation Reform Act:  A plaintiff must "specify each statement alleged to have been misleading, [and] the

17

reason or reasons why the statement is misleading.  15 U.S.C. § 78u4(b)(1)(B).  And, for "each act or omission alleged" to be false or misleading, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2).  If a securities fraud claim fails to satisfy the Rule 9(b) and the PSLRA standards, the Court must dismiss it.  Fin. Acquisition Partners, LP v. Blackwell, 440 F.3d 278, 287 (5th Cir. 2006).

Drawing on these principles, the defendants seek the safe harbor of a quick dismissal but their efforts are premature, given what is before the Court.

III.

Section 10(b) of the Securities Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j(b).

Rule 10b-5 provides that it is unlawful for a person, whether directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under

18

```
                    which they were made, not misleading, or
                    (c) To engage in any act, practice, or course
                    of business which operates or would operate as
                    a   fraud   or   deceit   upon   any   person,   in
                    connection with the purchase or sale of any
                    security.
```

17 C.F.R. § 240.10b-5.

To state a claim under Section 10-b, plaintiffs must allege

(1) a material misrepresentation or omission by the defendant; (2)

scienter;   (3)   a   connection   between   the   misrepresentation   or

omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss

causation.   <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>,

552 U.S. 148, 157 (2008).   The Securities and Exchange Act of

1934's definition of "security" includes an "investment contract."

15 U.S.C. 78c(a)(1).

The parties dispute whether the plaintiffs' interest in OTS

constitutes an "investment contract."   That issue is central to

these   motions   and   makes   Rule   12(b)(6)   preemptive   relief

inappropriate.

                                   A.

In <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 301 (1946), the United

States Supreme Court constructed a liberal test to evaluate whether

a contract, transaction, or scheme is an "investment contract":   In

an investment contract, "a person [1] invests his money [2] in a

common enterprise and [3] is led to expect profits solely from the

efforts of a promoter or a third party."   The High Court's later

decisions reveal that the factor requiring reliance on a third party's "sole" efforts is flexible and not to be interpreted literally, <u>see, e.g.</u>, <u>Int'l Bhd. Of Teamsters v. Daniel</u>, 439 U.S. 551, 561 (1979); the Court more loosely defines an investment contract as "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." <u>United Housing Found., Inc. v. Forman</u>, 421 U.S. 837, 852 (1975)); <u>see</u> <u>Williamson v. Tucker</u>, 645 F.2d 404, 418 (5th Cir. 1981) ("[T]he word 'solely' . . . should not be interpreted in the most literal sense."). The U.S. Court of Appeals for the Fifth Circuit directs this variation: Whether an agreement is an investment contract depends on whether "the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." <u>Youmans v. Simon</u>, 791 F.2d 341, 345 (5th Cir. 1986).

When applying these standards, the Court is mindful that "general partnership or joint venture interests are ordinarily not securities because of the level of managerial control exercised by a general partner." <u>Nunez v. Robin</u>, No. 09-5445, 2010 WL 3021618, at *3 (E.D. La. July 29, 2010), <u>aff'd</u> No. 10-30808, 2011 WL 817523 (5th Cir. Mar. 9, 2011) (per curiam); <u>see</u> <u>Youmans</u>, 791 F.2d at 346 (Joint venturers or general partners "are usually not covered under the securities law [because] they are entrepreneurs, not investors,

and have the ability to take care of their own interests because of the inherent powers available to them."); <u>Williamson</u>, 645 F.2d at 422 ("Although general partners and joint venturers may not individually have decisive control over major decisions, they do have the sort of influence which generally provides them with access to important information and protection against a dependence on others.").

The Court, however, understands that in some limited circumstances a general partnership interest may be a "security":

> Whether a general partner's or joint venturer's interest may be considered a security depends upon whether: (1) an agreement among the parties leaves so little power in the hands of the partner or venture that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

<u>Williamson</u>, 645 F.2d at 424.  It is the third exception on which the plaintiffs primarily rely.

Expanding upon this exception, the Fifth Circuit has written:

> A genuine dependence on others might also exist where the partners are forced to rely on some particular non-replaceable expertise on the part of a promoter or manager.  Even the most knowledgeable partner may be left with no meaningful option when there is no reasonable

21

> replacement for the investment's manager.  For
> example, investors may be induced to enter a
> real estate partnership on the promise that
> the partnership's manager has some unique
> understanding of the real estate market in the
> area in which the partnership is to invest.

Id.

This exception is more often applied with restraint and caution; "'the securities laws do not extend to every person who lacks the specialized knowledge of his partners or colleagues, without a showing that this lack of knowledge prevents him from meaningfully controlling his investment.'" Nunez, 2010 WL 3021618, at *4 (quoting Robinson v. Glynn, 349 F.3d 166, 171-72 (4th Cir. 2003)).  The Fifth Circuit has observed that a "joint venturer who lacks the business experience and expertise necessary to intelligently exercise partnership powers may also be dependent on the investment's promoter or manager." Williamson, 645 F.2d at 423.  Ultimately, "[a]n investor who is offered an interest in a general partnership or joint venture should be on notice . . . that his ownership rights are significant, and that the federal securities acts will not protect him from a mere failure to exercise his rights."[4] Id. at 422.

_____

[4] "[T]he definition of the term 'security' in the context of a suit based on the federal securities laws may reach the merits of the case and thereby limit the court's discretion to dismiss." Williamson, 645 F.2d at 416.  This Court's strong presumption on a slim 12(b)(6) record such as this one is that a partnership or joint-venture interest is not a security; the burden of convincing the Court otherwise lies with the plaintiffs.  See id.

The Court stresses for the purposes of the present motions, a major difference in the value of a Rule 12(b)(6) thrust in contrast to that of Rule 56.  At the summary judgment phase, concluding that an investor's monetary contribution to a joint-venture agreement to fund a mining operation did not create an investment contract, Judge Fallon rejected application of Williamson's third exception in Nunez v. Robin, No. 09-5445, 2010 WL 3021618 (E.D. La. July 29, 2010).  Even though it was clear that the investor did not have exclusive control over the scope and course of the business and lacked expertise in the mining industry, he had retained some degree of managerial control through his access to financial information.  Id. at *4.  He was the only partner to sign checks on behalf of the operation and served as its managing partner.  This, Judge Fallon found, "preserved 'the sort of influence which generally provide[d] [him] with access to important information and protection against a dependence on others.'"  Id. (quoting Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc., 840 F.2d 236, 241 (4th Cir. 1988)).  Notably, no partner in the joint venture held a majority share.[5]

_____

[5]  The Fifth Circuit recently affirmed Judge Fallon's decision, finding that the investor did not rely on another's expertise for every decision relevant to his management.  He had access to the relevant financial data from another source and failed to demonstrate that the mining expert was uniquely capable of his role that the investor and his partners were unable to find a replacement for him within reasonable limits.  Nunez, 2011 WL 817523, at * 5.  The record in Nunez provided more factual insights than does the record in this case.

B.

Based on the facts pled in their amended complaint, the Court finds that the plaintiffs have alleged sufficient facts to sustain their federal securities claim.   This case, facially at least, presents a situation contemplated by Williamson:  where the Court's evaluation of "the definition of the term 'security' . . . may reach the merits of the case and thereby limit the court's discretion to dismiss for lack of subject matter jurisdiction." 645 F.2d at 416.   Whether the plaintiffs' interests in OTS constitute an investment contract cannot be resolved at this phase under bare facts as pled.   The defendants' motions are therefore DENIED.

IV.   State-Law Claims[6]

Under Louisiana law, consent to a contractual obligation "may be vitiated by error, fraud, or duress."   LA. CIV. CODE art. 1948. Plaintiffs allege that they are entitled to rescind their contract to sell their shares based on either their own error or the defendants' fraud.[7]

---

[6]   With or without the federal claims, the Court may exercise its jurisdiction over this claim sitting in diversity; the plaintiffs and defendants are completely diverse, and the minimum amount in controversy is met.

[7]   WestPac and Smith contend that the plaintiffs cannot sustain their rescission claims without first tendering the payment they received for their shares.   This assertion is based on stale case law questionable in status; the proposition appears

A threshold question arises with regard to the question of rescission: May the plaintiffs sustain the claim of rescission against all the remaining defendants, or is the claim actionable only against WestPac or Smith, the express parties to the contract?

Costner asserts that the rescission claim necessarily involves parties to a contract of which Costner was not a party; plaintiffs' amended complaint shows only that a contract possibly formed between the plaintiffs and either WestPac or Smith.  The plaintiffs respond that the agreement to purchase plaintiffs' interest in OTS transferred the units to 'Smith or his designee', and Costner told Contogouris on several occasions that Smith was acquiring the shares solely or mostly for Costner's benefit; plaintiffs aim to retain their claim against Costner as the ultimate beneficiary of the sale.

It is clear to the Court that the Louisiana Civil Code articles on rescission clearly self-limit their application to parties to a contract.  But plaintiffs, throughout their complaint, plead facts to support that Smith may have acquired their shares on Costner's behalf; they assert that Costner told them that Smith spoke for him; that Smith stated that he was acquiring the shares on Costner's behalf; that Costner somehow confirmed to them that Smith was acquiring the shares on his behalf.  When they sold their shares, moreover, plaintiffs transferred them to Smith *or*

unsettled at best.

25

his designee.  Costner?

Finding that plaintiffs have pled with sufficient plausibility and specificity that Costner in law was a party to the contract for the purposes of both <u>Iqbal</u> and Rule 9(b), the Court turns to the plaintiffs' claims for rescission based on error and fraud as they relate to WestPac, Smith, and Costner.

### A.   Error

"Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known by the other party." LA. CIV. CODE art. 1949.  "Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation." LA. CIV. CODE art. 1950.  The plaintiffs, however, "may not avail [themselves] of [their] error if the [defendants are] willing to perform the contract as intended by the part[ies] in error." LA. CIV. CODE art. 1951.  "A party who obtains rescission on grounds of his own error," as here, "is liable for the loss thereby sustained by the other party unless the latter knew or should have known of the error." LA. CIV. CODE art. 1952.  "The court may refuse rescission when the effective protection of the other party's interest requires that the contract

26

be upheld. In that case, a reasonable compensation for the loss he has sustained may be granted to the party to whom rescission is refused." Id.

1.

With respect to their claim of error, plaintiffs allege

> [They] were operating under the mistaken belief that their membership interests in OTS would be purchased with funds held by Smith and/or WestPac rather than with funds properly belonging to OTS. Defendants knew, or should have known, that plaintiffs never would have sold their interest in OTS had they known that OTS' funds which otherwise would have been distributed to plaintiffs would be used to purchase their interests in OTS. Plaintiffs were also unaware that Doug Suttles of BP had stated to Costner and Smith, as the BP senior executive charged with cleaning up the Deepwater Horizon Spill, that "we're giving an order of 32," or alternatively had made a firm and binding commitment from BP to purchase 32 units prior to the sale of their membership interests.
> . . . These errors vitiated plaintiffs' consent to sell their interests in OTS to WestPac and/or Smith. Plaintiffs are entitled to a recission of the transfer of their ownership interest in OTS together with damages equal to the amount of the distribution that would have been paid to plaintiffs had they remained members of OTS owning 28% and 10% respectively from June 18, 2010 to present, or such other reasonable compensation as may be due plaintiffs.
> . . . Although the purchase agreement for plaintiffs' interest in OTS did not nominally sell that interest to Costner, plaintiffs aver upon information and belief, and based on representations made to them that Smith was acting for Costner and Westpac, and that Costner was an owner of Westpac, that Costner,

> either directly or indirectly, obtained
> beneficial ownership of plaintiffs' interest
> in OTS. The assignment executed by
> Contogouris and Baldwin transferred their
> interests in OTS to 'Smith or his designee,'
> which Contogouris and Baldwin always believed
> was Costner. To the extent Costner directly
> acquired ownership of that interest, either by
> counter-letter or otherwise, plaintiffs also
> seek recission against defendant Costner.

2.

Turning to the language of Louisiana Civil Code article 1950, it seems that "the circumstances the parties regarded, or should in good faith have regarded, as a cause of the obligation," has plausibly been pled: that is, the fact that the plaintiffs faced only two options, either to sell their shares or to respond to a significant cash call. Had the plaintiffs known of the BP arrangements at the time they entered their contract to sell their shares, they could have well known that a need to respond to the cash call was unnecessary.[8] As pled, moreover, the plaintiffs have shown that this "cause . . . should have been known by the other party," LA. CIV. CODE art. 1949, because, plaintiffs plead, WestPac, Smith, and Costner secretly orchestrated the deal with BP while they simultaneously demanded a cash call. From their amended complaint, as pled, it is not entirely clear whether the plaintiffs "knew or should have known of the error." LA. CIV. CODE art. 1952. The amended complaint seems to contradict itself on this point.

---

[8] Whether BP's deposit indeed obviated the need for a cash call is in dispute, but is not a question to be answered here.

But, this is not fatal to the plaintiffs' claims at this phase; perhaps that this issue can be clarified and developed more fully as this case proceeds.

Accordingly, finding that plaintiffs' have pled a claim of rescission with sufficient plausibility against the three defendants, plaintiffs' rescission claim against WestPac, Smith, and Costner based on the plaintiffs' error survives these motions to dismiss.

### B.   Fraud

Louisiana Civil Code article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." Although "[f]raud may also result from silence or inaction," LA. CIV. CODE art. 1953, "'[t]o find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information." Thomas v. Pride Oil & Gas Corp., Inc., 633 F. Supp.2d 238 (W.D. La. 2009) (quoting Greene v. Gulf Coast Bank, 593 So.2d 630, 632 (La. 1992).

To state a claim of fraud under Louisiana law, the plaintiffs must show (1) intent to defraud and (2) actual or potential loss or damages. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 438 (5th Cir. 2000). Where, as here, a claim is based on fraudulent misrepresentation, the plaintiffs must also show that their reliance on the misrepresentation was justifiable. Jefferson

v. Lead Indus. Ass'n,, Inc., 930 F. Supp. 241 (E.D. La. 1996)
(Vance, J.).  Although "[f]raud does not vitiate consent when the
party against whom the fraud was directed could have ascertained
the truth without difficulty, inconvenience, or special skill[,]
[t]his exception does not apply when a relation of confidence has
reasonably induced a party to rely on the other's assertions or
representations." LA. CIV. CODE art. 1954.  "In pleading fraud or
mistake, the circumstances constituting fraud or mistake shall be
alleged with particularity," LA. CIV. CODE art. 856, and must meet
Rule 9(b)'s pleading requirements.  See Dorsey v. Portfolio
Equities, Inc., 540 F.3d 333, 338-39 (5th Cir. 2008).  To plead
fraud adequately, the plaintiffs must "specify the statements
contended to be fraudulent, identify the speaker, state when and
where the statements were made, and explain why the statements were
fraudulent." ABC Arbitrage v. Tchuruk, 291 F.3d 336, 350 (5th Cir.
2002).  But, "[t]he pleading requirements for fraud may be relaxed
where the facts related to the alleged fraud are peculiarly within
the perpetrator's knowledge." Pinero v. Jackson Hewitt Tax Serv.
Inc., 594 F.Supp. 2d 710, 720 (E.D. La. 2009) (Vance, J.).

                              1.

     In support of their claim of fraud, the plaintiffs allege

          The actions of Costner, Smith and Westpac, as
          detailed herein, including the use of OTS
          funds to acquire plaintiffs' interest in OTS,
          the misleading statement that there was "no
          deal" with BP, the failure to disclose other
          comments made by BP official Doug Suttles,

                              30

constituted fraud. If those funds were
transferred from OTS to Smith or WestPac as a
distribution, then plaintiffs would also have
been entitled to a distribution in the amount
of $3.8 million. At no time did defendants
represent that the funds used to acquire
plaintiffs' interest in OTS would be anything
other than funds belonging to Pat Smith,
WestPac or from third party funds secured by a
lender who did not receive security in
property not then belonging to defendants.
However, is precisely what occurred, all
constituting fraud.
. . . Costner's statement that there was "no
deal", and both Smith and Costner's omission
of facts related to other comments regarding
the transaction made by BP, the details of the
letter of intent, and to the extent defendants
knew they had a firm commitment from BP to
purchase separators from OTS, and told
plaintiffs that they did not, such omission of
a material fact constituted fraud.
. . . By reasons of defendants' fraud,
plaintiffs are entitled to recission [sic] of
the sale of their membership interests in OTS,
and further entitled to receive all dividends
or distributions that would have been made to
them as 38% owners of OTS from June 11, 2010
to the present, or such other reasonable
compensation as may be due them.

2.

The defendants narrowly dispute that the plaintiffs do not

meet Rule 9(b)'s pleading standards. WestPac and Smith assert that

the plaintiffs plead neither deception nor reliance; Costner adds

that the plaintiffs fail to allege a fraudulent misrepresentation.

The Court disagrees. The plaintiffs allege deception and

fraudulent misrepresentations because they allege that WestPac,

Smith, and Costner knew that BP had reached a deal with OTS but

obscured this fact from the plaintiffs through a series of half-

31

statements and non-disclosures in order to lure plaintiffs into a cheap sale of their interests, which the plaintiffs have clearly detailed throughout their amended complaint. The plaintiffs' amended complaint vividly charges and specifies fraud: they would not have sold their interests in OTS had they known what they claim was the full truth.[9] The Court therefore finds that the plaintiffs' claim of rescission based on their allegations of fraud satisfies the requisite pleading standards.

Having found that personal jurisdiction over Rabobank is lacking; that whether plaintiffs' OTS interests constitute investment contracts under the federal securities laws cannot be judged by Rule 12(b)(6); that fraud has been properly enunciated; and that the plaintiffs have met pleading standards for their state law rescission claims, IT IS ORDERED:   Rabobank's motion is GRANTED; Costner's motion is DENIED; and WestPac and Smith's motion is DENIED.

IT IS FURTHER ORDERED:   Plaintiffs' claims against Rabobank are DISMISSED.

New Orleans, Louisiana, June 7, 2011

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[9]   Whether Costner was under a duty to disclose under state law was not adequately briefed.