UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SPYRIDON C. CONTOGOURIS, ET AL.                CIVIL ACTION

Versus                                          NO: 10-4609

WESTPAC RESOURCES, ET AL.                       SECTION "F"

ORDER & REASONS

Before the Court is Pacific West Resources, LLC's motion to bifurcate discovery.  For the reasons that follow, the motion is DENIED.

**Background**

This case arises out of a marketing agreement inspired in the wake of the Deepwater Horizon oil spill.  Despite its initial success, it soon soured.

The details of this case are ample, yet still seem to be emerging.  At some time in the 1990s, Kevin Costner, through his corporation C.I.N.C., Inc., financed and oversaw the development of technology which could separate oil from water.  Toward the beginning of the 2000s, Costner coordinated with Spyridon Contogouris, a New Orleans-area resident, to market the technology and the separation device which implements it. Contogouris and C.I.N.C. entered into an agreement under which Contogouris would receive a commission for any units he sold.  It is unclear how long this agreement was to endure.

Flashforward to Spring 2010.  Contogouris and his family met

Costner for a meal on April 17, 2010 in Biloxi, Mississippi. Costner told Contogouris that he had sold his rights to the separator technology and his ownership stake in C.I.N.C. to Bret Sheldon after attempts to market the oil-separation system were not successful.  Providentially, only three days later, a now-infamous drilling rig called Deepwater Horizon exploded.  The result: a catastrophic oil spill that saturated much of the Gulf of Mexico.    In the first days of the spill, Contogouris claims that contacts within the oil-and-gas industry revealed to him the extent of the catastrophe before it was public knowledge; he quickly recognized a significant opportunity for C.I.N.C. and himself.  He first tried to reach Costner to discuss marketing the technology for its use in the unfolding clean-up effort. When that was unsuccessful, Contogouris contacted Sheldon and C.I.N.C. directly to discuss obtaining an exclusive agreement to acquire the units for use in the Gulf of Mexico region.  It is unclear what came of that conversation.

   Unsuccessful in his attempts to approach BP directly, Contogouris determined that he would need to bring in partners who could lend assistance in gaining access to BP.  He formed a joint-venture agreement, which eventually transformed into a partnership under the name of Ocean Therapy Solutions, LLC (OTS), comprising the following people and entities, some based in Louisiana, some not:  Stephen Baldwin, John Houghtaling, Patrick

Smith, WestPac Resources, LLC (an organization in which both Costner and Smith owned shares), and L&L Properties (an entity formed by WestPac together with locals Frank Levy and Franco Valobra).  OTS quickly accomplished a threshold goal:  On May 3, 2010, OTS and C.I.N.C. entered into a marketing agreement, granting OTS exclusive rights to market the oil-separation system in the Gulf of Mexico.

By May 10, 2010, Contougoris registered OTS with the Louisiana Secretary of State.  An operating agreement soon resettled and established their ownership stakes as follows: Contougoris, 28 percent; Baldwin, 10 percent; Houghtaling, 21.5 percent; Valobra, 5 percent; L&L Properties, 15.5 percent; and WestPac, 20 percent.  The agreement required a 60 percent super-majority for OTS to take any action.  From this point through his withdrawal from OTS, Contogouris asserts that he was OTS's "first founding member, managing member, and largest shareholder."  Levy was installed as OTS's CEO.

OTS soon suffered from internal disagreement and distrust among its membership.  On the one hand, Contogouris, holding the largest stake in OTS, and Levy, OTS's CEO, wanted the company to use a business model which would insure recurring business and the possibility of marketing the device to other major oil companies.  They proposed renting units to BP at a fair price in a long-term agreement.  Houghtaling and Smith, together

3

representing 41.5 percent of total shares, on the other hand, favored a less complicated approach involving a one-time sale of the equipment to BP at a higher price.  As a result of this disagreement (along with a separate conflict between Levy and Hougtaling), Levy withdrew from OTS, conveying all his shares to Houghtaling.  Houghtaling took Levy's place as CEO and eventually transferred Levy's share to Costner.

At the same time, Contogouris and Smith began to clash. Beginning in late May, Costner and Smith allegedly told Contogouris and Baldwin that they needed to each make a $1.14 million cash contribution to fund OTS's operation without explaining why.  Contogouris agreed to raise part of this money, but insisted upon being told to what uses the cash would be put. The explanation never came.  Eventually, Smith notified Contogouris and Baldwin that if they did not respond to the cash call, their shares would be diluted.  Alternatively, Smith and/or WestPac proposed to buy Contogouris's and Baldwin's shares for $1.4 million and $500,000, respectively.  (Contogouris alleges that these interests were to be acquired for Costner's benefit.) Fueling their conflict was Contogouris's growing suspicion that Costner and Smith were trying to maximize their own profit, by hoodwinking Contogouris and Baldwin into selling their shares while at the same time finalizing an undisclosed deal with BP. Contogouris contends that he felt added pressure because Costner

4

and Smith were in the position to force a cash call in that they now had the support of Houghtaling and Valobra; collectively, they had the needed sixty-percent super-majority called for in the operating agreement.  (None of these people or the entities they represented, however, independently held the necessary share to form a super-majority.)

From an outsider's perspective, however, BP had not yet been particularly responsive to OTS.  OTS members pressed forward with promoting the technology through the media and Costner's appearance before Congress to discuss the technology and his efforts to have BP employ it to help deal with the oil spill.  These outreach efforts seemed to have their desired effect: Before Costner testified, BP agreed to meet with OTS members at Houghtaling's house and signed a letter of intent to purchase several units of the device.  Contogouris claims he was excluded from this meeting at the last minute; only Houghtaling, Smith, and Costner were present to advocate OTS's interests.  The next morning, when Baldwin and Contogouris asked Costner about his meeting with BP, Costner allegedly denied that they had reached a binding deal, responding only that a non-binding letter of intent had issued.  Contogouris and Baldwin suspected that something resembling a binding deal had in fact been reached.  Contogouris further complains that no one told him that the letter of intent would make OTS self-funding, possibly obviating the need for any

5

investor cash contributions to the company.

Costner testified before Congress on June 9, 2010 and announced that BP had placed an order for the technology. Costner reiterated to the press his statement that BP had placed an order. Contogouris attempted to contact Costner without success. Costner's attorney allegedly relayed to Contogouris that no deal had been reached with BP and hoped public pressure would cause BP to yield to a binding agreement. It is clear from the complaint, however, that Contogouris knew of the likelihood of a binding deal by June 8. That same day, because of continued demands for a cash contribution without sufficient explanation of the use to which it would be put—and perhaps due in part to Costner's (alleged) unraveling pattern of untruths—Contogouris made a trip to Los Angeles to sell his interests.

The original proposed agreement called for WestPac or Smith to pay the purchase price of $1.9 million ($500,000 of which represented Baldwin's share) upon execution of the agreement. But by June 10, Smith sought to change the payment terms, offering to pay a ten percent deposit by the next day, followed by the remaining payment a week after that. It appears Contogouris had no objection to this arrangement at the time. But Contogouris alleges now that Costner, Smith, and WestPac orchestrated a nefarious scheme to acquire Contogouris's and Baldwin's interests without having to pay any cash of their own,

simultaneously depriving Contogouris and Baldwin of their share of any profits from BP; as the story goes, Costner, Smith, and WestPac scrambled to acquire Contogouris's and Baldwin's interests knowing that BP soon would pay an $18 million deposit to OTS; they would use part of BP's deposit to buy the shares.

The ten percent deposit reached the Contogouris and Baldwin bank account through a transfer from WestPac's account with Rabobank, N.A. in California on June 11, 2010, as promised.  The next day, BP executed a purchase agreement with OTS for thirty-two units.  The gross price was over $52 million; BP promised to make an advance deposit of $18 million and publicly announced the deal on June 15, 2010.

Rather than arrange for a deposit to an account already opened by Contogouris for OTS in Louisiana, a different bank account was opened in OTS's name at Rabobank in California, apparently without Houghtaling's, Contogouris's, or Baldwin's knowledge or authorization.  It was into this unauthorized account that BP paid its $18 million deposit on June 16.  All members of OTS received a distribution.  All except Baldwin and Contogouris.  Baldwin and Contogouris claim that at the time the $18 million deposit was made, they were still members of OTS and thus entitled to a distribution because full payment for their surrendered interests was still pending (even though they reached a final agreement to sell their interests before the deposit was

made).

That same day, Smith e-mailed Contogouris to let him know that "he had the cash" and was prepared to close on the sale of Contogouris's and Baldwin's interests.  On June 18, 2010, payment was complete:  OTS transferred funds from its Rabobank account to WestPac's Rabobank account, and then transferred from the WestPac Rabobank account to Contogouris and Baldwin.  The parties signed documents to finalize the transfer.

Alleging a federal securities claim and other claims arising under Louisiana state law, Contogouris and Baldwin have sued Costner, Smith, WestPac, and Rabobank.

Defendants moved the Court to dismiss the plaintiffs' claims.  By Order and Reasons dated June7, 2011, the Court denied Costner's motion and WestPac and Smith's motion.  The Court granted Rabobank's motion.  Defendant WestPac now moves to bifurcate discovery between liability and damages.

## II.

WestPac is concerned that allowing discovery to be used for damages determinations would require significant additional time and expense for the parties, and could expose WestPac's confidential information.

The Court is unpersuaded that bifurcation of discovery would help the efficient resolution of this bloated case.  Many of the witnesses who would give testimony as to liability and damages

appear to overlap, and bifurcation of discovery may require that the same witnesses be deposed twice.  This would save neither time nor expense.  Additionally, the plaintiffs needs to prove economic loss in order to show liability on their Rule 10(b)(5) claim.  <u>Stoneridge Partners, LLC v. Scientific Atlanta</u>, 552 U.S. 148, 157 (2008).  Bifurcating discovery between liability and damages, and imposing a June 15, 2010 cut-off date could limit the plaintiffs' ability to support their liability argument.  To the extent that WestPac wishes to maintain its sensitive information confidential, the Court notes that plaintiffs have offered to enter into a confidentiality order.

Accordingly, IT IS ORDERED: WestPac's motion to bifurcate is DENIED.

New Orleans, Louisiana, November 9, 2011

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE