UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SPYRIDON C. CONTOGOURIS, ET AL.    CIVIL ACTION

Versus             NO: 10-4609

WESTPAC RESOURCES, ET AL.     SECTION "F"

<u>ORDER & REASONS</u>

Before the Court is the defendants' motion for summary judgment on the plaintiffs' claims and the defendants' counter-claims.  For the reasons that follow, the defendants' motion is DENIED.

## **Background**

This case arises out of a marketing agreement inspired in the wake of the Deepwater Horizon oil spill.  Despite its initial success, relationships soon soured.

At some time in the 1990s, Kevin Costner, through his corporation C.I.N.C., Inc., financed and oversaw the development of technology which could separate oil from water.  Toward the beginning of the 2000s, Costner coordinated with Spyridon Contogouris, a New Orleans-area resident, to market the technology and the separation device which implements it. Contogouris and C.I.N.C. entered into an agreement under which Contogouris would receive a commission for any units he sold.  It is unclear how long this agreement was to endure.

Flashforward to Spring 2010.  Contogouris and his family met Costner for a meal on April 17, 2010 in Biloxi, Mississippi.

Costner told Contogouris that he had sold his rights to the
separator technology and his ownership stake in C.I.N.C. to Bret
Sheldon after attempts to market the oil-separation system were
not successful.  Providentially, only three days later, a now-
infamous drilling rig called Deepwater Horizon exploded in the
Gulf.  The result: a catastrophic oil spill that saturated much
of the Gulf of Mexico.

     In the first days of the spill, Contogouris claims that
contacts within the oil and gas industry revealed to him the
extent of the catastrophe before it was public knowledge; he
quickly recognized a significant opportunity for C.I.N.C. and
himself.  He first tried to reach Costner to discuss marketing
the technology for its use in the unfolding clean-up effort.
When that was unsuccessful, Contogouris contacted Sheldon and
C.I.N.C. directly to discuss obtaining an exclusive agreement to
acquire the units for use in the Gulf of Mexico region.  It is
unclear what came of that conversation.

     Unsuccessful in his attempts to approach BP directly,
Contogouris determined that he would need to bring in partners
who could lend assistance in gaining access to BP.  He formed a
joint-venture agreement, which eventually transformed into a
partnership under the name of Ocean Therapy Solutions, LLC (OTS),
comprising the following people and entities, some based in
Louisiana, some not:  Stephen Baldwin, John Houghtaling, Patrick

Smith, WestPac Resources, LLC (an organization in which both Costner and Smith owned shares), and L&L Properties (an entity formed by WestPac together with locals Frank Levy and Franco Valobra).  OTS quickly accomplished a threshold goal:  On May 3, 2010, OTS and C.I.N.C. entered into a marketing agreement, granting OTS exclusive rights to market the oil-separation system in the Gulf of Mexico.

By May 10, 2010, Contougoris registered OTS with the Louisiana Secretary of State.  An operating agreement soon resettled and established their ownership stakes as follows: Contougoris, 28 percent; Baldwin, 10 percent; Houghtaling, 21.5 percent; Valobra, 5 percent; L&L Properties, 15.5 percent; and WestPac, 20 percent.  The agreement required a 60 percent super-majority for OTS to take any action.  From this point through his withdrawal from OTS, Contogouris asserts that he was OTS's "first founding member, managing member, and largest shareholder."  Levy was installed as OTS's CEO.

OTS soon suffered from internal disagreement and distrust among its membership.  On the one hand, Contogouris, holding the largest stake in OTS, and Levy, OTS's CEO, wanted the company to use a business model which would insure recurring business and the possibility of marketing the device to other major oil companies.  They proposed renting units to BP at a fair price in a long-term agreement.  Houghtaling and Smith, together

representing 41.5 percent of total shares, on the other hand,
favored a less complicated approach involving a one-time sale of
the equipment to BP at a higher price.  As a result of this
disagreement (along with a separate conflict between Levy and
Hougtaling), Levy withdrew from OTS, conveying all his shares to
Houghtaling.  Houghtaling took Levy's place as CEO and eventually
transferred Levy's share to Costner.

At the same time, Contogouris and Smith began to clash.
Beginning in late May, Costner and Smith allegedly told
Contogouris and Baldwin that they needed to each make a $1.14
million cash contribution to fund OTS's operation, without
explaining why.  Contogouris agreed to raise part of this money,
but insisted upon being told to what uses the cash would be put.
The explanation never came.  Eventually, Smith notified
Contogouris and Baldwin that if they did not respond to the cash
call, their shares would be diluted.  Alternatively, Smith and/or
WestPac proposed to buy Contogouris's and Baldwin's shares for
$1.4 million and $500,000, respectively.  (Contogouris claims
that these interests were to be acquired for Costner's benefit.)
Fueling their conflict was Contogouris's growing suspicion that
Costner and Smith were trying to maximize their own profit, by
hoodwinking Contogouris and Baldwin into selling their shares
while at the same time finalizing an undisclosed deal with BP.
Contogouris contends that he felt added pressure because Costner

4

and Smith were in the position to force a cash call in that they
now had the support of Houghtaling and Valobra; collectively,
they had the needed sixty-percent super-majority called for in
the operating agreement.  (None of these people or the entities
they represented, however, independently held the necessary
shares to form a super-majority.)

     From an outsider's perspective, however, BP had not yet been
particularly responsive to OTS.  OTS members pressed forward with
promoting the technology through the media and Costner's
celebrated appearance before Congress to discuss the technology
and his efforts to have BP employ it to help deal with the oil
spill.  These outreach efforts seemed to have their desired
effect:  Before Costner testified, BP agreed to meet with OTS
members at Houghtaling's house and signed a letter of intent to
purchase several units of the device.  Contogouris claims he was
excluded from this meeting at the last minute; only Houghtaling,
Smith, and Costner were present to advocate OTS's interests.  The
next morning, when Baldwin and Contogouris asked Costner about
his meeting with BP, Costner allegedly denied that they had
reached a binding deal, responding only that a non-binding letter
of intent had issued.  Contogouris and Baldwin suspected that
something resembling a binding deal had in fact been reached.
Contogouris further complains that no one told him that the
letter of intent would make OTS self-funding, possibly obviating

the need for any investor cash contributions to the company.

Costner testified before Congress on June 9, 2010 and announced that BP had placed an order for the technology. Costner reiterated to the press his statement that BP had placed an order.  Contogouris attempted to contact Costner without success.  Costner's attorney allegedly relayed to Contogouris that no deal had been reached with BP and hoped public pressure would cause BP to yield to a binding agreement.  It is clear from the complaint, however, that Contogouris knew of the likelihood of a binding deal by June 8.  That same day, because of continued demands for a cash contribution without sufficient explanation of the use to which it would be put—and perhaps due in part to Costner's (alleged) unraveling pattern of untruths—Contogouris made a trip to Los Angeles to sell his interests.

The original proposed agreement called for WestPac or Smith to pay the purchase price of $1.9 million ($500,000 of which represented Baldwin's share) upon execution of the agreement. But by June 10, Smith sought to change the payment terms, offering to pay a ten percent deposit by the next day, followed by the remaining payment a week after that.  It appears Contogouris had no objection to this arrangement at the time. But Contogouris alleges now that Costner, Smith, and WestPac orchestrated a nefarious scheme to acquire Contogouris's and Baldwin's interests without having to pay any cash of their own,

simultaneously depriving Contogouris and Baldwin of their share of any profits from BP; as the story goes, Costner, Smith, and WestPac scrambled to acquire Contogouris's and Baldwin's interests knowing that BP soon would pay an $18 million deposit to OTS; they would use part of BP's deposit to buy the shares.

The ten percent deposit reached the Contogouris and Baldwin bank account through a transfer from WestPac's account with Rabobank, N.A. in California on June 11, 2010, as promised.  The next day, BP executed a purchase agreement with OTS for thirty-two units.  The gross price was over $52 million; BP promised to make an advance deposit of $18 million and publicly announced the deal on June 15, 2010.

Rather than arrange for a deposit to an account already opened by Contogouris for OTS in Louisiana, a different bank account was opened in OTS's name at Rabobank in California, apparently without Houghtaling's, Contogouris's, or Baldwin's knowledge or authorization.  It was into this allegedly unauthorized account that BP paid its $18 million deposit on June 16.  All members of OTS received a distribution.  All except Baldwin and Contogouris.  Baldwin and Contogouris claim that at the time the $18 million deposit was made, they were still members of OTS and thus entitled to a distribution because full payment for their surrendered interests was still pending (even though they reached a final agreement to sell their interests

before the deposit was made).

That same day, Smith e-mailed Contogouris to let him know that "he had the cash" and was prepared to close on the sale of Contogouris's and Baldwin's interests.  On June 18, 2010, payment was complete:  OTS transferred funds from its Rabobank account to WestPac's Rabobank account, and then transferred from the WestPac Rabobank account to Contogouris and Baldwin.  The parties signed documents to finalize the transfer.

Contogouris and Baldwin later sued Costner, Smith, WestPac, and Rabobank.[1]  Plaintiffs assert a securities fraud claim under Rule 10(b)(5) of the Securities and Exchange Act; a claim under Louisiana law to void the sale of their interests based on error; and another claim under Louisiana law alleging misrepresentations and omissions of material fact on the defendants' part in connection with the sale of plaintiffs' interests.  Defendants filed breach of contract counterclaims against the plaintiffs, alleging that their claims violate a release the from liability provision found in the agreement transferring the plaintiffs' interests in OTS to the defendants.

Plaintiffs initially moved for partial summary judgment, arguing that their claims are not covered by the language of the release from liability provision of the parties' Transfer Agreement.  The Court disagreed, and in its February 7, 2012,

---

[1] Rabobank has since been dismissed from the case.

Order and Reasons found that the plaintiffs' claims are covered by the release provision's language.

Defendants now move the Court for summary judgment on plaintiffs' claims and defendants' counterclaims. Defendants argue that because the release covers plaintiffs' claims, they should not be allowed to go forward. Defendants further contend that their lawsuit is a breach of the Transfer Agreement release provision.

## II.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary

9

judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  <u>Id</u>.  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.

III.

In its February 7, 2012 Order and Reasons, this Court found that the release provision of the parties' Transfer Agreement covered the plaintiffs' claims in this case.  The Court stated:

> Both provisions make clear that claims
> related to contracts, agreements or
> arrangements entered into by OTS will be
> released from liability.  This plainly covers
> the purchase BP made from OTS, which
> qualifies as an arrangement entered into by
> OTS, as well as a contract.  The plaintiffs'
> claims relate directly to this arrangement:
> they are all grounded on the assertion that
> defendants had misled them about the BP
> purchase as well as the source of the money
> used in the transaction, and caused them to
> sell their interests while possessing
> inaccurate information.  Moreover, the scope

10

> of the release provision is broad: no claims
> relating to such arrangements are allowed.
> Far from allowing plaintiffs' claims, the
> release provisions found in the Agreement bar
> them.

Defendants now ask the Court for summary relief, arguing that because the release provision's language covers the plaintiffs' claims, the plaintiffs are in breach of the Transfer Agreement by having brought them.

The Court denies summary judgment because the question of the breadth of the release provision is distinct from the question of whether the Transfer Agreement is itself valid. Plaintiffs have maintained throughout the litigation that they challenge the Transfer Agreement itself, and seek to have it rescinded because they allege it was based on the fraud and misrepresentations of the defendants.  Although the Court has determined the scope of the release provision's language, whether past fraud on the defendants' part vitiates the Transfer Agreement itself is still open and to be determined.  Quite obviously, it seems, that question must be answered before the Court can enforce the provisions of the Agreement.

The Transfer Agreement in this case is governed by Louisiana law.  Under Article 3082 of the Louisiana Civil Code, "a compromise may be rescinded for error, fraud, and other grounds for the annulment of contracts.  Nevertheless, a compromise cannot be rescinded on grounds of error of law or lesion."

11

Furthermore, Louisiana courts recognize the distinction between determining the scope of a release provision and the validity of the release itself.  See, e.g., Brown v. Drillers, Inc., 630 So. 2d 741, 747-48 (La. 1994) ("This is not such a case.  Plaintiff does not attack the validity of the release instrument; rather, she contends that it does not extend to the wrongful death claims asserted.").  The Fifth Circuit U.S. Court of Appeals has recognized the applicability of Article 3082 to rescission actions.  In Re: Vioxx Products Liability Litigation, 412 Fed. Appx. 653, 654 (5th Cir. 2010).  And defendants do not contest the applicability of Article 3082.

In support of their position, defendants invoke Robin v. Binion, 271 Fed. Appx. 436 (5th Cir. 2008), Ingram Corp. v. J. Ray McDermott & Co., Inc., 698 F.2d 1295 (5th Cir. 1983), and Stinnett v. Colorado Interstate Gas Co., 227 F.3d 247, 255-56 (5th Cir. 2000).  Defendants argue that these case support their position that a broadly worded release provision, like the one in the Transfer Agreement, bars fraud claims entirely.  While these cases may provide some superficial support for the defendants' arguments, the Court finds that they do not drive the result here.  A close reading of these cases reveals that even they recognize the distinction between determining the scope of a release provision and the validity of the agreement that the release provision appears in.

12

In <u>Ingram</u>, the plaintiff sought to invalidate a prior agreement and release because it was discovered after entering into a transaction with the defendant company that the defendant was engaged in a past antitrust conspiracy, all allegedly to the detriment of the plaintiff.  Ingram argued that the defendant's concealment of its past antitrust violations vitiated the release that Ingram had signed.  The district court refused to enforce the release provisions on the defendant's motion for summary judgment, but the Fifth Circuit reversed, and held that the release should be enforced.  The Fifth Circuit reasoned that the defendant's past antitrust behavior was not sufficiently related to the negotiation or signing of the release agreement, and therefore defendant's concealment of it did not vitiate the release.  Since, however, claims for past antitrust violations were covered by the broad language of the release, such claims were barred.  Defendants seize on this result, and argue for the same outcome here.  Importantly, however, defendants' position gives short shrift to the Fifth Circuit's broader discussion of when fraud can vitiate a contract in the fullness of the opinion. The appeals court recognized that "fraudulent inducement to nullify a contract is obviously a different matter.  It can vitiate a release.  This is hornbook law." <u>Ingram</u>, 698 F.2d, at 1314.  The Fifth Circuit continued:

> Had Ingram demonstrated that McDermott had
> somehow duped it into entering the release

> agreements by some affirmative deceptive act
> [...] at the time of their negotiation, then
> there would be no question that the release
> agreements were ineffectual.

Id. The issue in Ingram then was not that fraud claims would always be barred once a broadly-worded release provision had been signed, but that a plaintiff must show that the alleged fraud directly influenced the decision to sign the release. Patently, a fact issue and a vital one. If a plaintiff could make that showing, then even a broadly worded release would not prevent the case from going forward. Ingram was unable to make that showing. Importantly then, the Fifth Circuit recognized the distinction between claims for a defendant's past fraudulent activity, which a broad release could bar, and those fraud claims which could go forward because they attacked the validity of the release provision itself. Id. at 1314. As the court stated: "We find the District Court's initial distinction between fraudulent concealment of an antitrust conspiracy and fraud sufficient to vitiate a release to be the correct way to analyze the dispute." Id.

Similarly, the plaintiffs in Stinnett sought to invalidate the release provision they has signed based on past fraud committed by the defendant that did not directly relate to the negotiation and signing of the agreement. As in Ingram, the Fifth Circuit reasoned that a broadly worded release will bar such past fraud claims, when there is no showing of how that past

14

activity served to cause the plaintiff to sign a release.[1]
Stinett, 227 F.3d, at 256.

The plaintiffs assert that the defendants' alleged
misrepresentations in the days leading up to the sale of their
shares in OTS constitute the kind of fraud that, if proved, is
sufficient to vitiate the release agreements.  The Court agrees.
The plaintiffs have maintained since the beginning of this
lawsuit, that had they known about the completed deal with BP,
and had they realized that a portion of the buyout money was
allegedly coming from OTS distributions that they themselves were
entitled to share in, they would not have sold their interests.
This is not to say, of course, that plaintiffs have met their
burden on these questions, but, rather, to suggest that summary
relief in not appropriate on this record.


                              III.

The Court also denies summary judgment based on the
defendants' assertion that the plaintiffs ratified the sale of
their OTS interests.  Under Louisiana law, "previous tender is
not required in a suit to set aside a sale on the ground of

---

[1] Another factor driving the result in Stinnett were state law
considerations.  The Fifth Circuit drew an important distinction
between affirmative misrepresentations, and misrepresentations
because of the defendant's silence.  This distinction was
important in the case because it is important under Texas law.
It is not, however, the same under Louisiana law, where
misrepresentation can occur both by silence and affirmative
statements.

fraud." <u>Nicol v. Jacoby</u>, 103 So.2d 33, 36-36 (La. 1925); <u>see</u> <u>also</u> <u>American Guaranty Co. v. Sunset Realty & Planting Co.</u>, 208 La. 772, 836-838 (La. 1945).  Defendants have not shown this rule to be inapplicable.  Instead, the defendants rely on Fifth Circuit cases and some district courts for the proposition that by not tendering the money plaintiffs received in exchange for the sale of their interests in OTS, they ratified the sale and are now barred from seeking rescission.  Two of the cases that defendants cite, <u>Grillet v. Sears, Roebuck & Co.,</u> 927 F.2d 217, 220 (5th Cir. 1991) and <u>Williams v. Phillips Petroleum Co.,</u> 23 F.3d 930, 937 (5th Cir. 1994) relate only to the employment context, and specifically, instances in which an employee who has accepted severance payment and signed a release of all claims in connection with the termination of his employment later seeks to have that release invalidated.  Because these cases involve causes of action under Title VII, federal common law governs the validity of the releases that the plaintiffs signed, and the circumstances under which retaining the consideration received might constitute ratification.  <u>Williams</u>, 23 F. 3d, at 935 (5th Cir. 1994); <u>see also</u> <u>Reid v. IBM Corp.</u>, No. 95-1755, 1997 U.S. Dist LEXIS 8905, at * 34 (citing cases from various Courts of Appeal, including <u>Grillet</u>, for the proposition that "discrimination releases can be ratified by retention of benefits

and that such benefits must be tendered back to revoke a
release.").

In this case, by contrast, there is no implication that
federal common law should determine whether plaintiffs ratified
the sale.  Rather, the Court finds the Fifth Circuit's opinion in
Bogy v. Ford Motor Co., 538 F.3d 352, 353 (5th Cir. 2008) is
instructive on the correct analysis to apply.  In Bogy, the
plaintiffs argued that the settlement release they signed was the
product of fraud, and they sued to rescind the settlement
agreement.  The Fifth Circuit analyzed the question of tender
back and ratification as one of state law, determined by the law
of the state in which the contract was executed.  The Court finds
this to be the correct approach to questions of ratification
outside the specialized employment context of Grillet and its
progeny.  Accordingly, because Louisiana law does not require
tender back when the plaintiff alleges fraud in the making of a
compromise, the Court finds that plaintiffs here have not
ratified the sale of their interests in OTS, as defendants urge.
Nicol v. Jacoby, infra p. 16.

Accordingly, IT IS ORDERED: the defendants' motion for
summary judgment on the plaintiffs' claims and the defendants'
counterclaims is DENIED.

17

New Orleans, Louisiana, March 6, 2012.

MARTIN L. C. FELDMAN

UNITED STATES DISTRICT JUDGE