IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SPYRIDON C. CONTOGOURIS and STEPHEN A. BALDWIN | : : : | CIVIL ACTION |
| | : | NO. 10-4609 |
| VERSUS | : : | SECTION "F"(1) |
| WESTPAC RESOURCES, LLC, PATRICK N. SMITH, KEVIN M. COSTNER and RABOBANK, N.A. | : : : | JUDGE FELDMAN |
| | : | MAG. JUDGE SHUSHAN |

## MEMORANDUM IN SUPPORT OF MOTION FOR A NEW TRIAL

**MAY IT PLEASE THE COURT:**

Plaintiffs Spyridon C. Contogouris and Stephen A. Baldwin now move for a new trial on grounds that the Court's granting of the Motions in Limine filed by defendants Kevin M. Costner and Patrick N. Smith related to Smith's "bad acts" so colored the proceedings that it resulted in a miscarriage of justice. Plaintiffs also request a new trial on grounds that the jury's verdict, finding that none of the defendants defrauded plaintiffs, was contrary to the great weight of the evidence. This is particularly true with respect to the evidence produced against defendants Smith and Pacific West Resources.[1]

**PROCEDURAL SETTING**

Shortly before trial, defendants brought six motions in limine, five by defendant Costner, and one by defendant Smith. On the morning of trial, the Court ruled on all six motions. The Court denied defendants' motion related to John Houghtaling's acquisition of 4717 St. Charles Avenue and the opening of a bank account by Ocean Therapy Solutions at Rabobank, N.A.

---

[1] Although plaintiffs move for a new trial on all issues, the Court may grant a new trial on one or more causes of action while denying a new trial on other causes of action. For instance, the Court might uphold the finding of no liability of defendants on the Rule 10(b)(5) claims while granting a new trial on the Louisiana fraud cause of action.

However, the Court granted all of the remaining motions, excluding any evidence that post-dated March 20, 2011, excluding evidence of joint defense agreements, excluding evidence of derivative claims, and most importantly, excluding all evidence of Patrick Smith's alleged "bad acts." These bad acts consisted of:

 (1) Smith's default on an obligation to repay $194 million to New York banks in connection with a Snowmass, Colorado real estate development, which plaintiffs intended to offer as proof of financial motive;

 (2) Smith's misleading statements in opening an unauthorized bank account for OTS at Rabobank, an account which enabled Smith to use OTS's money to purchase plaintiffs' interest in the company;

 (3) Smith's theft of a $1.045 million loan made by Ted Skokos's charitable foundation to OTS;

 (4) Smith's misappropriation of millions of dollars from OTS and Pacific West Resources;

 (5) Smith's submission of a false financial statement to an Italian investor, Gian Angelo Perucci, which induced Perucci to invest $3.75 million, in Blue Planet Solutions, and whose money was used to facilitate the buyout of John Houghtaling; and

 (6) Smith's theft of monies from OTS by disguising them as expense reimbursements for expenses that were never incurred.

The Court excluded all of this evidence with the exception of information related to the opening of the bank account on the first morning of trial. The Court expressed the view that the evidence was being excluded under Rule 403 of the Federal Rules of Evidence, as the Court considered the probative value of these undisputed facts to be outweighed by the unfair prejudicial effect on one or more of the defendants.

 Plaintiffs' counsel privately expressed concerns amongst themselves that the Court had effectively "gutted" their intended presentation of the evidence. Part and parcel of any fraud case is proof of motive and intent. Smith's actions displayed a systematic campaign of fraud and

deceit, which was well documented in the exhibits plaintiffs' intended to offer at trial, consisting of numerous emails documenting Smith's underhanded dealings.  As a result of these rulings, plaintiffs had to delete untold pages of deposition testimony from witnesses Grigsby, Alvarez, and Skokos, and had to strip out hundreds of questions from their anticipated examinations of witnesses Smith, Houghtaling, Costner and Rod Lake.

On the second day of trial, after Smith testified to his "transparent" business practices, and after presentation of text messages showing that Smith instructed his subordinates to secret information regarding an $18 million advance deposit made by BP, the Court modified its ruling in part.  It permitted counsel for plaintiffs to make inquiry regarding the theft of monies from Ted Skokos in the form of oral testimony from Skokos related to the theft.  The Court admonished counsel not to present the documentary evidence detailing Smith's bad acts.  Perhaps the three most important of these were e-mails authored by Ted Skokos and Rod Lake.  On December 30, 2010, Skokos sent Smith an email documenting his unlawful theft of a $255,000 cash call, and "most egregious", which Smith "pocketed" after putting it in the OTS bank account for 24 hours.  (SK 210, attached as Exhibit 1).  On March 19, 2011, Skokos penned a scathing email to Smith outlining Smith's "devious scheming" and Skokos' intent to turn Smith over to the authorities.  (SK391, attached as Exhibit 2).  Prior to trial, plaintiffs took over 250 pages of deposition testimony from Costner's business associate Rod Lake, who plaintiffs were effectively prohibited from calling as a witness by the Court's rulings.  In his testimony, Lake detailed his painstaking investigation of Smith's acts of theft.  These were summarized in an email dated February 14, 2011 from Lake to Smith, in which he stated:

> Pat you forged documents, misled investors, overstated expenses, wrote
> unfounded checks to yourself from company accounts and essentially lied to
> every partner, consultant and employee of the company was involved with.  That's
> the sad part of all of this, no one will ever remember anything you contributed in

> the creation of this business, they will only remember the lies, cheating and the stealing.

(SK355, Exhibit 3 hereto).  The jury therefore never learned that Smith was forced out of the company by Costner and Lake, and that he resigned due to his misconduct and criminal acts on January 7, 2011.

The Court may have been motivated in limiting the evidence by a desire to expedite the trial and avoid "piling on".  However, the jury was apparently misled as its findings exonerated Smith and Westpac Resources, for whom Smith was acting.  The jury expressly found that none of the defendants had misled plaintiffs in connection with the sale of their interest (Jury Interrogatory No. 3).  The jury therefore must have believed Smith's testimony regarding his "transparent" business practices, a conclusion which no rational trier of fact could have reached if the full scope of Smith's actions had been presented.  Moreover, the jury reached its determination with shocking speed.  Despite nine days of evidence, 18 jury interrogatories, and complex instructions from this Court, the jury reached a verdict in slightly over an hour.  Defendant Smith certainly did not expect such a swift result in his favor, as his counsel moved for a mistrial on the morning of the sixth day of trial, claiming he could not finish his case in the time allotted by the Court.

**RULE 59 STANDARD**

Rule 59(a)(1)(a) permits a district court to grant a new trial following a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  In ruling on a Rule 59 motion, the Court makes the same inquiry as on a motion for judgment as a matter of law, but imposes a less stringent standard.  A district court should grant a new trial motion if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.  *McGuire v. Davis,* 437 F.2d 570 (5th Cir. 1971); *Gasperini v. Center*

*for Humanities,* 518 U.S. 415, 468 (1996). Absent a showing of clear error or manifest injustice, it will generally be appropriate to deny relief requested pursuant to Rule 59 since litigants should neither be required nor without good cause be permitted to relitigate already decided matters. *Gallagher v. Crete Carrier Corp.,* 2009 WL 2925441 (D.Conn. September 10, 2009). Rule 59 is not a vehicle for relitigating old issues, presenting a case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple. *Sequa Corp. v. GBJ Corp.,* 159 F.3d 134, 144 (2nd Cir. 1988).

Rule 59 has a less stringent standard than Rule 50 in two respects. A new trial may be granted even if there is substantial evidence supporting the jury's verdict. In ruling on the motion, the trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. However, the district court must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice. *DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124 (2nd Cir. 1998); *Menghi v. Hart,* 745 F.Supp.2d 89 (E.D.N.Y. 2010).

A ruling on a Rule 59 motion is deferential, meaning it is only subject to reversal for an abuse of discretion. An abuse of discretion will only be found where the decisions rests upon an error of law or a clearly erroneous factual finding, or where the district court's decision cannot be located within the range of permissible decisions. *Robinson v. Wix Filtration Corp.,* 543 F.3d 403 (4th Cir. 2010).

**ARGUMENT**

I. **The Court's Decision to Exclude the Full Extent of Smith's "Bad Acts" Misled the Jury into a Verdict Exonerating All Defendants.**

Although plaintiffs appreciate the Court's diligent and careful consideration given for its evidentiary rulings, with respect it was error to limit the scope of the jury's knowledge of Smith's

"bad acts." Rule 403 requires that the Court conclude that the probative value of a particular piece of evidence is <u>substantially</u> outweighed by the danger of unfair prejudice, confusion, undue delay, or the presentation of cumulative evidence. For this reason, Rule 403 is infrequently used to exclude otherwise relevant evidence. In striking this balance, the courts give maximum probative value to the evidence, while giving that same evidence minimum prejudicial effect. *World Wide Ass'n. of Specialty Programs v. Pure, Inc.,* 450 F.3d 1152 (10th Cir. 2006).

Here, the probative value of the evidence was not substantially outweighed by its prejudicial effect. The exclusion of this evidence, we respectfully submit, precluded a fair outcome of the case. As evidenced by the swiftness with which the jury reached its verdict, it is apparent they believed Smith's testimony that he was innocent of any wrongdoing. The Court may recall that Smith's cross examination revealed that he was less than truthful, as he was impeached many times by his deposition testimony. The jury was only given a small taste of his fraudulent acts directed at Skokos, Westpac and Costner, as they were not permitted to hear the evidence regarding the millions of dollars he wrongfully took from OTS and Westpac that would have been documented by Alvarez and Lake. They were not permitted to see the contemporaneous documentary evidence that supported Skokos' testimony that Smith stole money from a charitable foundation and duped him into being the only "dummy" who made the fictitious cash call that was used to drive plaintiffs out of OTS.

The jury's apparent belief in Smith's testimony also impacted the verdicts in favor of Westpac and Costner. As for Westpac, it is undisputed that Smith was at all times acting as an agent of Westpac in his dealings with plaintiffs and others. He proposed and approved the cash call for Westpac. He signed all OTS resolutions requiring action by Westpac. Westpac therefore was vicariously responsible for his actions. As to Costner, it was undisputed that Smith acted as

Costner's agent. Frank Levy testified that Smith and Costner were "a team," a fact confirmed by Costner in his own testimony. Smith was therefore Costner's agent, and Costner is liable for his actions. The "team" concept was uncontroverted in all the evidence put into the record. The exclusion of evidence regarding Smith's prior acts thus had a spillover effect that impacted the verdicts in favor of the other defendants.

## II. The Verdict was Contrary to the Weight of the Evidence and Amounted to a Miscarriage of Justice.

As set forth in this Court's jury instructions, plaintiffs alleged that several facts were concealed from them that were material to their decision to sell. The allegations were: (a) the proposed cash call was a sham; (b) BP looked favorably on giving an advance; (c) Skokos had infused capital into the company; (d) defendants had agreed to pay themselves $600 per hour; (d) defendants had agreed to divide their shares and the Levy shares; (e) BP's Suttles indicated at the June 7 meeting that BP would place an order; (f) a contract calling for an $18 million deposit had been prepared; (g) an unauthorized and illegal bank account was formed and OTS' money was used to acquire their interest; and (h) Smith had placed an order with CINC for the first 10 units on June 10, 2010, the day prior to the sale of plaintiffs' interest.

Each one of these allegations was proven by uncontroverted evidence at trial. Every witness testified a cash call never took place. Smith and BP' Suttles both testified that an advance had been discussed before plaintiffs sold out on June 11, and that BP looked favorably on making an advance payment. Skokos and Smith testified that Skokos infused $3 million into the company on June 10, and it was uncontroverted that Smith did not tell plaintiffs, or John Houghtaling, about this infusion of money. Smith, Houghtaling and Costner confirmed that they agreed to pay themselves $600 per hour, 12 hours per day, 7 days per week, and did not tell plaintiffs about it. Smith and Costner admitted that they had agreed with Houghtaling to divide

7

the Levy shares prior to the sale of plaintiffs' interest, and plaintiffs were not informed of this. Suttles testified that he gave OTS every indication he would be placing an order in the June 7 meeting, a fact confirmed by substantial evidence, including: (a) Maxwell's June 8 text message to Ozzie Johnston that an order for 32 had been placed, sent only hours after Maxwell heard Smith tell Contogouris there was "no deal"; (b) Costner's June 9 testimony before Congress that BP had placed an "initial order"; (c) Smith's texts to Skokos on June 9 indicating that BP placed a $50 million purchase order; (d) Houghtaling and Smith's TV appearances on June 10, where they did not contradict the interviewer's statement that BP had ordered 32 units; and (d) Houghtaling's June 10 interview on WWL Radio, where he explicitly said that BP had placed this order during the June 7 dinner meeting.

It was also uncontroverted that defendants secreted from plaintiffs the drafting of a June 10 contract by Daniel Grigsby calling for an $18.2 million deposit from BP. Grigsby admitted he prepared the document and did not tell Contogouris about it. Smith's June 10 e-mail to all members of OTS, other than the plaintiffs, enclosing the draft contract confirms that it was secreted from plaintiffs. The fact that Smith opened the bank account at Rabobank without authorization was confirmed by Houghtaling, and Costner admitted that he agreed to the opening of the account. Indeed, it was undisputed from the testimony of defendants' counsel, Grigsby, and defendants' accountant, Alvarez, that Smith and Bates misrepresented their status of members of OTS in opening the Rabobank account on June 16. It was also uncontroverted, from the testimony of Boudreaux, that Smith used OTS' funds to buy plaintiffs' interest, as he wired $1.25 million from the OTS account to Westpac Development's account on the morning of June 18. Without any right to do so, Smith exercised unilateral control over the $18 million BP

deposit. Smith also admitted that he placed the order with CINC on June 10 for the first 10 units and did not tell plaintiffs about this.

Despite the uncontroverted evidence, the jury found that none of the defendants concealed material information from the plaintiffs. In light of the uncontroverted evidence on all of these points, the jury found that no omission of material fact had been committed. It is respectfully submitted that this was a miscarriage of justice and contrary to the weight of the evidence, thus giving this Court latitude to order a new trial.[2]

For the foregoing reasons, plaintiffs request that the Court grant their motion for a new trial.

Respectfully submitted this 10th day of July, 2012.

                WAITS, EMMETT & POPP

                *s/John F. Emmett*
                RANDOLPH J. WAITS, T.A. (La. 13157)
                JOHN F. EMMETT (La. 1861)
                MATTHEW F. POPP (La. 24608)
                1515 Poydras Street, Suite 1950
                New Orleans, Louisiana 70112
                Telephone: (504) 581-1301
                Telecopier: (504) 585-1796

---

[2] Defendants may argue that the exclusion of evidence and the jury's erroneous conclusion that no fraud had been committed is harmless error because of the jury's answer to Jury Interrogatory No. 17 dealing with confirmation of the sale. The jury never should have reached this Interrogatory because of its prior findings of no suppression or mistatement of material fact. In any event, the jury's finding to this Interrogatory is inconsistent with its finding of no omission or misrepresentation since the interrogatory presupposes that the plaintiffs' knew of the misrepresentation, a misrepresentation the jury found was never made.

        KING, KREBS & JURGENS, PLLC

        *s/Timothy S. Madden*
        HENRY A. KING (La. 7393)
        TIMOTHY S. MADDEN (La. 21733)
        MONICA J. MANZELLA (La. 29965)
        4500 Place St. Charles
        201 St.Charles Avenue
        New Orleans, Louisiana   70170
        Telephone:  (504) 582-3800
        Telecopier: (504) 582-1233
        Attorneys for Spyridon C. Contogouris and
            Stephen A. Baldwin

## C E R T I F I C A T E   O F   S E R V I C E

    I hereby certify that a copy of the foregoing has been served on all counsel of record by depositing same in the United States mail, postage pre-paid and properly addressed, or by filing same using the Court's electronic filing system, or by other means, such as facsimile or electronic mail, on this 10th day of July, 2012.

        *s/John F. Emmett*